**Burrell MURCHISON and Richard Murchison, Appellants,**

v.

**The STATE of Texas, Appellee.**

**Nos. 14–00–00305–CR, 14–00–00306–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

July 25, 2002.

Rehearing Overruled Aug. 22, 2002.

Buddy Stevens, Angleton, for appellants.

Kevin P. Keating, Houston, for appellees.

Panel consists of Justices ANDERSON, HUDSON, and FROST.

## OPINION

KEM THOMPSON FROST, Justice.

In this consolidated appeal, appellants Burrell Murchison and Richard Murchison challenge their convictions for securities fraud. They assert the trial court erred by excluding expert testimony, refusing their mistake-of-fact instruction, charging the jury in a way that violated their constitutional right to a unanimous verdict, and making numerous comments on the weight of the evidence. Appellants also assert the evidence was not legally or factually sufficient to support the jury's finding that they had an intent to defraud and that the evidence was factually insufficient to prove that Richard Murchison was liable under the law of parties. We affirm both of the trial court's judgments.

### I. FACTUAL AND PROCEDURAL BACKGROUND

In 1985, appellants, along with Joel Hurst, formed a Texas limited partnership in which a Texas corporation served as the general partner. Eventually, the partnership dissolved; however, the business operations continued as the newly formed Hurst–Murchison Corporation. Later, Joel Hurst left the business. Appellants reorganized the company in September of 1993, and created a holding company called Murchison Group, Inc. ("Murchison Group"). Wholly owned by appellants, Murchison Group, in turn, established a subsidiary called Murchison Investment Bankers ("Investment Bankers"). Investment Bankers was a securities broker/dealer and had two major sections—institutional sales and retail sales. Murchison Group also established a subsidiary named Murchison Financial Group ("Financial Group"). Financial Group was primarily composed of licensed insurance sales representatives and was largely concerned with developing business with individual investors.

The Murchison companies were successful and grew rapidly. By 1993, Investment Bankers was one of the top twenty broker/dealer firms in Texas, measured by volume of business. Investment Bankers earned ninety-five percent of the revenue of these companies, and it was the "engine that drove the companies." Appellants were the principal owners of the Murchison companies. Richard Murchison ("Richard") generally handled matters related to sales and personnel, and Burrell Murchison ("Burrell") generally handled financial issues.

In 1992, Hurst–Murchison sold debentures to a number of investors. Dale Hearn worked as a certified financial planner for the Murchison companies for a number of years and later managed the retail side of Investment Bankers. According to Hearn, Burrell stated that the company was selling the 1992 debentures to build reserves, and the money raised was not supposed to be used to purchase equipment or other types of capital. Rather, according to Burrell, the sales proceeds were to be "left in the bank" to increase the company's reserves and allow it to do other kinds of business. The debentures were to pay ten-percent interest. The proceeds from the sale of the debentures were to be used to purchase securities issued by the United States Treasury ("Treasuries"). These Treasuries would pay six percent, making the net cost to the company of borrowing the money only four percent. This information was given to the sales representatives who were selling the debentures. Hearn testified that it was well known at the company that the 1992 debentures were backed by Treasuries.

Keith Mitcham worked as a certified financial planner. He joined the company in 1990, and eventually became head of the financial group. In 1992, Mitcham attend-ed a sales meeting concerning the debentures. Burrell and Richard were both present. At the meeting, Burrell again explained that the debentures would pay ten-percent interest and would be backed by Treasuries. Sales representatives were given this information to pass on to potential purchasers of the debentures. Mitcham sold a $50,000 debenture to his father-in-law, Dale Collins. Collins indicated he invested in a 1992 debenture, in part, because Mitcham told him the money would be held in some form of government securities.

The company received $450,000 from the sale of the 1992 debentures; however, the company purchased only $300,000 of Treasuries. Further, the company did not hold the Treasuries for the whole term of the debentures; rather, it sold the Treasuries in July of 1993. Nonetheless, the company made the required interest payments to the holders of the 1992 debentures until July 1994.

The Murchison companies had a good year in 1993. At the end of 1993, the total retained earnings of the companies was $996,000. However, the growth the companies had enjoyed did not continue into 1994. Investment Bankers had acquired several bonds that began to decline in value. This decline, along with other factors, caused Investment Bankers to begin experiencing operating losses in January 1994. At that time, the company had a loss of $116,000, of which $96,000 was caused by declining bond value. In February 1994, Investment Bankers lost $169,000. In March 1994, Investment Bankers lost $319,000, of which $189,000 was caused by declining bond value. In April of 1994, Investment Bankers lost $155,000, of which $78,000 was caused by declining bond value. By May 1994, the bonds in question were no longer on the books of the company, for reasons de-

scribed below. Despite this fact, the company still lost $75,000 in May of 1994. In June of 1994, Investment Bankers lost $259,000, and in July of 1994, the company lost $79,000. In sum, Investment Bankers had substantial operating losses in every month in 1994 in which it conducted business.

In April of 1994, Burrell and Richard summoned James Arnold, a salesman at Investment Bankers, to a private meeting. They told Arnold that the company owned some bonds and asked Arnold if he would consider placing the bonds with some of his accounts. Burrell and Richard told Arnold that it would be up to him to decide which accounts were appropriate. Arnold described his understanding of their request, stating:

> [U]pon doing the transaction, this would be for a temporary period of time because the firm wanted to keep the bonds but they wanted to get them off the books at the same time. And so what I was asked to do was to place them with my customers on a temporary basis, giving the customers the understanding that within a six-month period of time Murchison Investment Bankers would purchase the bonds back at the same price. So in effect the customer could collect the interest during that period of time and not have the risk of what happens to the bonds six months from now or if the market changes or anything like that.

At their meeting with Arnold, the Murchisons discussed a bond known as a "Freddie Mac 1668S," an inverse floater, collateralized mortgage obligation. Arnold sold this bond to his customers at the price the company had paid for the bond, even though this price was above the market price at the time. Arnold said that his customers agreed to that arrangement because they trusted him. Arnold did not

receive anything in writing documenting his meeting with Burrell and Richard, nor did he receive anything memorializing the repurchase arrangement that Burrell and Richard indicated would govern the sale of this bond to Arnold's clients. Arnold was able to sell the 1668S bond about thirty minutes after his meeting with the Murchisons. Arnold split the bond in half and sold the halves to two of his clients. Although Arnold made the repurchase agreement part of these sales, he did not document the repurchase agreement by filling out a "ticket," a document the company used internally to keep track of assets and liabilities. For these trades, Arnold's customers trusted his representations about the repurchase agreement and did not ask for confirmation of that agreement in writing at the time of the sales.

About a month later, Arnold met with Burrell regarding another bond, a principal-only bond designated 9424–H. This meeting was similar to the earlier meeting. Burrell told Arnold that the 9424–H bond was in the company's inventory and that they needed to get it off the books. Burrell asked Arnold to make the same arrangements for the sale of this bond as he had done for the 1668S bond. Burrell told Arnold that he was being given the opportunity to participate in these transactions because he had been a good salesman and because offering this investment opportunity would allow Arnold to "do something" for his customers. Arnold understood he would not be paid a commission for the sales of these two bonds, and Arnold was willing to waive his commission because he believed that, from his clients' perspective, these sales were "great—almost like a gift." Arnold reasoned that, after the company repurchased the bonds, these clients would use the money to purchase other investments through the company, and Arnold would receive commissions on

these subsequent sales. Further, the Murchisons explained to Arnold that he was doing a favor for the company as well as for his clients.

As to the sale of the 9424–H bond, Burrell also told Arnold that the company would guarantee the buyers of that bond a ten-percent return. Burrell signed a letter that explained the terms of the company's guarantee of a ten-percent return to the buyers of this bond. Arnold sent a copy of this letter to one potential customer; however, about a day and a half after Arnold received the letter, he returned it to Burrell at Burrell's request. Arnold eventually split the bond in half and sold the halves to two other clients.

Although Arnold no longer had the letter, the buyers of the 9424–H bond often called Arnold to ask for written confirmation of the terms by which they were buying this bond. Arnold approached both Burrell and Richard on at least a monthly basis for the next three or four months and tried to get this written confirmation. Initially, the Murchisons told Arnold the confirmation would be forthcoming. However, as time passed, they told him that there would be no written confirmation and that he should tell his customers to "hang in there." At this time, Arnold was aware that sales were falling dramatically, and as he watched the sales decline, he became increasingly concerned the company would not be able to repurchase the bonds he had placed with his customers. Arnold expressed his concerns to Burrell and Richard, and they told him not to worry and that everything was under control. They emphasized that, more than anything, it was important that Arnold make sure his customers felt confident.

Eventually, Arnold went to Dale Hearn, Investment Bankers' retail-compliance officer, to discuss his concerns. Hearn became more and more upset as Arnold told him the details of the bond transactions. Hearn believed that Arnold was describing an illegal scenario known as "bond parking." Hearn immediately took Arnold to speak with Richard and told Richard what Arnold had related to him. Richard said that he understood why Hearn was concerned but that this was a "gray area." Richard also told Arnold that the company would never do anything to hurt his clients and that he did not need to worry about this situation. Arnold was not satisfied with Richard's reassurances and sought advice about this situation from various people he trusted. Eventually, Arnold consulted an attorney and, on his counsel's advice, contacted the National Association of Securities Dealers ("NASD"), a private-sector provider of financial regulatory services that regulates the securities industry.

The NASD conducted an audit of Investment Bankers in August of 1994, in order to investigate Arnold's report and conduct a full sales-practice review. The NASD found that Investment Bankers had not included its obligations to repurchase the 1668S bond and the 9424–H bond in its reported liabilities. After booking these transactions and appropriately listing the liabilities, Investment Bankers was below the NASD's net-capital requirements and was forced to cease its business operations. Regarding these two bonds, the NASD determined that Investment Bankers should have booked additional liabilities totaling roughly $1.5 million and additional assets totaling $710,000. After making these adjustments, the company had a negative net-capital balance of approximately $750,000. According to an expert witness called by the State, Investment Bankers' records showed that the company had gone into a negative net-capital situation at some point in April of 1994.

Even though the Murchison Group and its affiliates were experiencing financial

problems in 1994, Burrell and Richard initiated the offering of a second group of debentures. On March 17, 1994, Burrell and Richard conducted a meeting at which they announced the following terms on which the new debentures would be sold: (1) a total of $500,000 in debentures would be sold in blocks of $25,000; (2) the debentures would pay ten-percent interest; (3) the debentures would be "good enough" to be sold into customers' IRA accounts; (4) after 24 months, the interest would increase to eleven percent, and after 48 months, it would increase to twelve percent; (5) the company would inventory approximately $2 million in bonds and $300,000 in cash as "collateral" for the new debentures; and (6) the proceeds from the sale of these debentures would be used to increase the net capital of the company.

Burrell and Richard presented the group with a booklet that described the company and included its 1993 financial statements. The booklet was to be used by the sales representatives to sell the debentures. During this period in early 1994, Burrell and Richard indicated that "everything was going great," that they were buying new properties, and that they recently had increased their capital and expanded. Charles Pugh, a retail salesman at the company, testified that everyone in the retail division and most of the people from the wholesale side of the company were present at this meeting. Pugh also stated that, whenever the sales representatives made a pitch to a potential buyer of debentures, they provided the potential customer with a copy of the 1993 financials. Responding to subsequent requests from Pugh for updated financials, the Murchisons told him he had the most current financial reports available.

Burrell also indicated to sales representatives and customers that the proceeds from the sales of the debentures would be used to buy Treasuries. Various customers who bought debentures from the company in 1994 testified that they would not have purchased the debentures if they had known any of the following: (1) that Investment Bankers had sustained operating losses in the early months of 1994; (2) that the company had sold the Treasuries that "backed" the 1992 debentures; (3) that the proceeds of the 1994 debentures would be used to help cover Investment Bankers' operating expenses; or (4) that the proceeds of the 1994 debentures would not be held in government securities. Several former sales representatives at the company testified that they believed the debentures were a safe investment and that they had sold the debentures to friends or family members who were looking for a safe investment.

David Pilant, an expert witness called by the State, analyzed the books of Investment Bankers and testified that the proceeds of the 1994 debentures were used to meet the company's operating expenses, including the salaries of Burrell and Richard, their expenses, and interest on the 1992 debentures. Pilant also testified that the company used the proceeds from the sales of the 1994 debentures to fund Burrell and Richard's 401(k) plans, their withholding taxes, lease payments on their cars, maintenance of property holdings, a yacht, and country-club dues.

By indictment, Burrell and Richard were charged with the felony offense of securities fraud under article 581–29(C) of the Texas Revised Civil Statutes. *See* TEX. REV.CIV.STAT. ANN. art. 581–29(C) (Vernon Supp.2002). The cases against Burrell and Richard were tried together to a single jury. In accordance with the indictments against them and in addition to other instructions and definitions, the trial court

gave the following charge to the jury as to each appellant:

Now therefore, if you find from the evidence beyond a reasonable doubt that heretofore on or about various dates between February 15, 1994 and July 25, 1994, in Harris County, Texas, the defendant [Burrell or Richard] Murchison, acting alone or with [the other defendant] as a party to the offense, as that term is hereinbefore defined, did then and there unlawfully, or intentionally, pursuant to one scheme and continuing course of conduct, directly or indirectly, offer for sale, and/or sell securities, namely, a subordinated debenture issued by the Murchison Group, Inc., to [sixteen named complainants], who are hereafter referred to as the complainants, and did obtain money in an aggregate amount of one hundred thousand dollars or more from the sale of said securities to the above complainants, and the defendant did then and there directly or indirectly engage in fraud by intentionally failing to disclose to the complainants the following material fact or facts which was/were known to the defendant and the defendant intentionally failed to disclose said fact or facts to the complainants for the purpose of inducing the complainants to purchase the said securities;

(1) That Hurst–Murchison Corporation, an affiliated entity of Murchison Group, Inc., and its predecessor in interest, had previously sold approximately $450,000.00 of similar subordinated debentures in 1992, and the defendant had ·directly and/or indirectly represented to the 1992 debenture purchasers that the 1992 debentures were collateralized or secured by United States Treasury Notes, when·in fact only approximately $300,000.00 in Treasury Notes were purchased or acquired to collateralize or secure the investments of the 1992 debenture purchasers, and said Treasury Notes were sold in approximately July of 1993, and that the revenues from the sale of 1992 subordinated debentures, and from the subsequent sale in approximately July of 1993 of the approximate $300,000.00 in United States Treasury Notes were placed in the general operating business bank account of Murchison Investment Bankers, Inc., also known as Murchison Investment Bankers, Ltd., and expended for the general operating expenses of the affiliated companies, Murchison Group, Inc., and the Murchison Investment Bankers, Inc., and/or for the personal use of Burrell Murchison, Chairman/Chief Executive Officer of the Hurst–Muchison Corporation and/or Murchison Group, Inc., and Richard Murchison, President of the Hurst–Murchsion Corporation and/or The Murchison Group, Inc., or

(2) That Murchison Investment Bankers, Inc., an affiliated company of The Murchison Group, Inc., an entity substantially responsible for producing the revenue and income of Murchison Group, Inc., had sustained net operating losses of approximately $77,000.00 in January of 1994; and/or approximately $112,000.00 in February of 1994; and/or approximately $211,000.00 in March of 1994; and/or approximately $155,000 in April of 1994; and/or approximately $75,000.00 in May of 1994; and/or approximately $25,000.00 in June of 1994; and/or approximately $75,000.00 in July of 1994, or

(3) That Murchison Investment Bankers, Inc., sold substantially its entire owned inventory of securities between approximately April 15, 1994 and June 24, 1994, thereby reducing Murchison Investment Bankers, Inc.'s net capitalization balances to limits less than permissible under the rules and regulations

of the National Association of Securities Dealers, or

(4) That the 1993 financial statements used by Murchison Investment Bankers, Inc., to promote the sale of the Instant Securities were outdated and showed the company to be in a positive, viable condition when in fact, the company needed revenues generated from the sale of the Instant Debentures to meet its ordinary operating expenses, or

(5) That revenues from the sale of the Instant Debentures Securities [sic] were needed for operating expenses and costs of The Murchison Group, Inc., and its affiliated companies, and to pay interest to purchasers of the 1992 aforementioned subordinated debentures and for the personal use of the aforementioned Burrell Murchison and Richard Murchison.

then you will find the defendant guilty as charged in the indictment.

The jury found both appellants guilty. The trial court assessed punishment for each appellant at sixteen years' confinement in the Institutional Division of the Texas Department of Criminal Justice.

## II. ISSUES PRESENTED ON APPEAL

In this consolidated appeal, appellants assert the following issues:

- Did the trial court abuse its discretion by excluding the testimony of appellants' expert, Dr. Kenneth Lehrer? (first issue)
- Did the trial court err when it denied appellants' request for a mistake-of-fact instruction in the jury charge? (second issue)
- Was there legally and factually sufficient evidence to support the jury's findings that appellants intended to defraud the complainants? (third, fourth, fifth, and sixth issues)

- Was there factually sufficient evidence to show that Richard was liable under the law of parties? (seventh, eighth, and ninth issues)
- Did the jury charge violate appellants' constitutional right to a unanimous jury verdict? (tenth issue)
- Did the trial court become an advocate for the State during trial by making numerous comments that conveyed its opinion of the professionalism of appellants' counsel and by ruling on several hearsay objections without asking the State for a response? (eleventh and twelfth issues)

## III. ANALYSIS AND DISCUSSION

**Did the trial court abuse its discretion by excluding Dr. Kenneth Lehrer's testimony?**

In their first issue, appellants assert the trial court abused its discretion when it excluded the testimony of Dr. Kenneth Lehrer, appellants' expert. We review the trial court's exclusion of Dr. Lehrer's testimony under the abuse-of-discretion standard of review. *See Weatherred v. State,* 15 S.W.3d 540, 542 (Tex. Crim.App.2000); *Penry v. State,* 903 S.W.2d 715, 762 (Tex.Crim.App.1995). A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App.1990). In determining whether the trial court abused its discretion, we consider whether the court acted without reference to guiding rules and principles; that is, whether the court acted arbitrarily or unreasonably. *Lyles v. State,* 850 S.W.2d 497, 502 (Tex. Crim.App.1993).

In appellants' offer of proof, Dr. Lehrer testified: (1) the increase in interest rates that caused the drop in value of the 1668S and 9424–H bonds was unforeseeable; (2)

it was reasonable for appellants to believe that they could pay back the complainants at the time the 1994 debentures were sold; (3) the Murchison companies did not need to disclose the existence of the repurchase agreements relating to the 1668S and 9424–H bonds; and (4) "the Securities and Exchange Commission Act of '33 and '34" requires buyers of debentures to take certain due-diligence measures on their own. The trial court sustained the State's objection that this testimony was not relevant and excluded this evidence.

■ On appeal, appellants argue the trial court abused its discretion in excluding this evidence under Texas Rule of Evidence 401. *See* Tex.R. Evid. 401. Appellants assert this evidence was relevant to their alleged fraudulent intent, which appellants claim was an alleged intent to sell the 1994 debentures knowing that the company did not have the ability to repay the debentures. To be relevant, evidence must be both material and probative. *Miller v. State*, 36 S.W.3d 503, 507 (Tex. Crim.App.2001). Evidence is material if it is addressed to the proof of any fact of consequence to the determination of the action. Tex.R. Evid. 401; *Miller*, 36 S.W.3d at 507. If the proponent establishes that the proffered evidence is material, Rule 401 also requires that the proponent establish the evidence is probative— that it tends to make the existence of a material fact more or less probable than it would be without the evidence. Tex.R. Evid. 401; *Miller*, 36 S.W.3d at 507.

■ Appellants argue that Dr. Lehrer's testimony was relevant to the issue of whether appellants intended that the company pay its obligations under the 1994 debentures and whether appellants knew that the company was unable to repay these obligations. This argument fails because this case does not involve these issues. As stated above, appellants were charged with intentional failure to disclose to the complainants one or more of the five material facts listed above ("Material Facts"). Appellants were not charged with either: (1) intending not to repay the 1994 debentures; or (2) knowing the company could not repay the 1994 debentures. The culpable mental state applies to the criminal act or acts with which the defendant is charged. *Cook v. State*, 824 S.W.2d 634, 637–38 (Tex.App.-Dallas 1991, pet. ref'd) (holding that culpable mental state under Tex.Rev.Civ.Stat. Ann. art. 581– 29(C) relates to conduct that allegedly violates this statute and not to damages to complainants that may be caused by this conduct). Dr. Lehrer's testimony regarding the foreseeability of the decrease in the bonds' value and his testimony relating to the company's ability to pay the debenture holders is not material to the charges that appellants intentionally failed to disclose to the complainants one or more of the Material Facts. Because this testimony is not addressed to the proof of any fact of consequence to the determination of this action, the trial court did not abuse its discretion in determining this testimony was not relevant. *See* Tex.R. Evid. 401; *Miller*, 36 S.W.3d at 507.

■ In their brief, appellants also make statements in passing that Dr. Lehrer's testimony was relevant for the following reasons: (1) it showed the company did not need to list as a liability the repurchase agreements relating to the 1668S and 9424–H bonds;[1] (2) to counter Donald Katz's testimony as to the value of the

---

1. In the offer of proof, however, Dr. Lehrer did not testify as to whether the Murchison companies needed to list the repurchase agreements as liabilities; rather, he testified that the Murchison companies did not need to disclose the existence of the repurchase agreements.

bonds; (3) to clarify Burrell's affidavit, which explained why the company wanted to sell the 1668S and 9424–H bonds and the purposes of those sales; (4) to explain why Burrell told Dale Hearn that "he didn't think that—they didn't know it was wrong;" (5) to explain Richard's statement that "this was a gray area;" and (6) to explain to the jury the responsibility of each complainant to act as a "reasonable investor." Appellants cite no authority in support of these conclusory statements. Texas Rule of Appellate Procedure 38.1(h) provides that the "brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX.R.APP. P. 38.1(h). Conclusory arguments which cite no authority present nothing for our review. *See Vuong v. State,* 830 S.W.2d 929, 940 (Tex.Crim.App.1992); *King v. State,* 17 S.W.3d 7, 23 (Tex.App.-Houston [14th Dist.] 2000, pet. ref'd). Therefore, appellants have waived error as to these items. *See Salazar v. State,* 38 S.W.3d 141, 147 (Tex.Crim.App.2001); *King,* 17 S.W.3d at 23.

■ Even if appellants had not waived error, we still would hold that the trial court did not abuse its discretion by excluding Dr. Lehrer's testimony on the ground it was not relevant. Regarding the repurchase agreements, Dr. Lehrer testified in the offer of proof that the Murchison companies did not have to disclose these agreements. However, appellants were not charged with failure to disclose the repurchase agreements. Nothing in Dr. Lehrer's testimony counters Donald Katz's testimony as to the value of the bonds in 1994, so the evidence was not probative on this point. *See Miller,* 36 S.W.3d at 507. The trial court admitted Burrell's affidavit into evidence, and in any event, it would not be an abuse of discre-

tion to find that explanations why appellants wanted to sell the bonds and why they thought the sales of the bonds were beneficial to their customers were not relevant to the charges that appellants failed to disclose the Material Facts. Except for the argument regarding the intent to repay the complainants, which we already have rejected, Dr. Lehrer's testimony does not explain either: (1) Burrell's alleged statement that "he didn't think that—they didn't know it was wrong" to guarantee the buyers of the bonds against any loss; or (2) Richard's statement that "this was a gray area."

■ Finally, Dr. Lehrer's discussion of each complainant's responsibility to act as a "reasonable investor" under federal securities law is not relevant to a criminal prosecution under a Texas statute that does not require proof of reliance, reasonable or otherwise. *See* TEX.REV.CIV.STAT. ANN. art. 581–29(C); *Birchfield v. State,* 401 S.W.2d 825, 828 (Tex.Crim.App.1966) (holding that TEX.REV.CIV.STAT. ANN. art. 581–29(C) does not require proof of reliance by the investor on defendant's fraud). Therefore, even if appellants had not waived their complaints as to these items, there would be no abuse of discretion as a result of the trial court's exclusion of Dr. Lehrer's testimony. *See Miller,* 36 S.W.3d at 507. Accordingly, we overrule appellants' first issue.

**Did the trial court err when it denied appellants' request for a mistake-of-fact instruction in the jury charge?**

In their second issue, appellants assert the trial court erred in refusing them a jury instruction on mistake of fact based on the following evidence: (1) Burrell's affidavit; (2) Donald Katz's testimony that he gave Burrell and Richard profit-and-

loss statements on a monthly basis;[2] (3) James Arnold's testimony that Richard stated that the repurchase agreements with the buyers of the bonds was "not really a black and white area, it's really a gray type of area;" (4) Burrell's alleged statement that "he didn't think that—they didn't know it was wrong" to guarantee the buyers of the bonds against any loss; and (5) testimony that the Murchison companies originally acquired the 1668S and 9424–H bonds through a mistake by a sales representative.

■ Under the defense of mistake of fact, "[i]t is a defense to prosecution that the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense." *See* TEX. PEN.CODE ANN. § 8.02(a). An accused has the right to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or contradicted, and regardless of what the trial court may or may not think about the credibility of the evidence. *Granger v. State,* 3 S.W.3d 36, 38 (Tex.Crim.App.1999). This rule is designed to ensure that the jury, not the judge, will decide the relative credibility of the evidence. *Id.* Therefore, the issue before this court is whether the evidence cited by appellants, if believed, raised a mistake-of-fact defense by negating appellants' intentional failure to disclose the Material Facts. *See* TEX. PEN.CODE ANN. § 8.02(a); *Granger,* 3 S.W.3d at 38. If the evidence viewed in a light favorable to appellants does not establish a mistake-of-fact defense, the trial court did not err in refusing an instruction. *See Granger,* 3 S.W.3d at 38.

■ First, in order to raise an issue of mistake of fact, the evidence, viewed in a light favorable to appellants, must have raised an issue as to the existence of a mistaken belief by appellants that negates the culpable mental state as to all five of the Material Facts. *See Gant v. State,* 814 S.W.2d 444, 452–53 (Tex.App.-Austin 1991, no pet.) (holding trial court did not err in refusing mistake-of-fact instruction in case under TEX.REV.CIV.STAT. ANN. art. 581–29(C), where mistaken belief was not raised as to each of the material facts that defendants allegedly failed to disclose). The evidence cited by appellants fails to raise an issue regarding an alleged mistaken belief by appellants that negates the culpable mental state as to all five of the Material Facts. Therefore, the trial court did not err in refusing appellants' mistake-of-fact instruction. *See Gant,* 814 S.W.2d at 452–53; *see also Gerber v. State,* 845 S.W.2d 460, 466–67 (Tex.App.-Houston [1st Dist.] 1993, pet. ref'd) (holding that failure to charge on mistake of fact as to manslaughter was harmless error where there was a mistake-of-fact instruction as to murder, jury convicted defendant of murder, and evidence supported murder conviction).

■ Furthermore, viewed in a light favorable to appellants, none of the evidence cited by appellants raises an issue regarding an alleged mistaken belief by appellants that negates the culpable mental state as to any of the Material Facts. Burrell's affidavit explains why appellants wanted to sell the bonds and why they thought the sales of the bonds were beneficial to their customers. This does not raise an issue regarding a mistaken belief that would negate intent as to appellants' failure to disclose.

**2.** Appellants also assert Katz testified that these statements indicated the company was in net-capital compliance; however, Katz did not so testify.

Appellants also cite certain testimony of Donald Katz. They claim that Katz testified he gave Burrell and Richard profit-and-loss statements on a monthly basis indicating the company was in net-capital compliance. However, the testimony cited by appellants says nothing about net-capital compliance; rather, Katz only says that he gave Burrell and Richard profit-and-loss statements on a monthly basis. Some of these statements appear to have been admitted as State's Exhibits 5–A through 5–F. Appellants do not discuss these exhibits or explain how they might show that the company was in net-capital compliance. On their face, these documents do not appear to address net-capital compliance. We have found no testimony from Katz that he gave appellants documents indicating the company was in net-capital compliance. Therefore, this testimony raises no issue as to mistake of fact.

Likewise, viewed in a light favorable to appellants, none of the following raises an issue regarding a mistaken belief that would negate intent as to appellants' failure to disclose the Material Facts: (1) Richard's alleged statement that the repurchase agreements with the buyers of the bonds was "a gray type of area;" (2) Burrell's alleged statement that "they didn't know it was wrong" to guarantee the buyers of the bonds against any loss; and (3) the testimony as to how the Murchison companies originally acquired the 1668S and 9424–H bonds. Accordingly, we overrule appellants' second issue.

**Was there legally and factually sufficient evidence to support the jury's findings that appellants intentionally failed to disclose one or more of the Material Facts?**

In their third, fourth, fifth, and sixth issues, appellants assert that there was legally insufficient evidence or, in the alternative, factually insufficient evidence to support the jury's findings of appellants' intentional failure to disclose one or more of the Material Facts. In evaluating a legal-sufficiency challenge, we view the evidence in the light most favorable to the verdict. *Wesbrook v. State,* 29 S.W.3d 103, 111 (Tex.Crim.App.2000). The issue on appeal is not whether we, as a court, believe the State's evidence or believe that appellants' evidence outweighs the State's evidence. *Wicker v. State,* 667 S.W.2d 137, 143 (Tex.Crim.App.1984). The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson v. State,* 819 S.W.2d 839, 846 (Tex.Crim.App.1991). The jury, as the trier of fact, "is the sole judge of the credibility of witnesses and of the strength of the evidence." *Fuentes v. State,* 991 S.W.2d 267, 271 (Tex.Crim.App. 1999). The jury may choose to believe or disbelieve any portion of the witnesses' testimony. *Sharp v. State,* 707 S.W.2d 611, 614 (Tex.Crim.App.1986). When faced with conflicting evidence, we presume the trier of fact resolved conflicts in favor of the prevailing party. *Turro v. State,* 867 S.W.2d 43, 47 (Tex.Crim.App. 1993). Therefore, if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must affirm. *McDuff v. State,* 939 S.W.2d 607, 614 (Tex.Crim.App.1997).

In contrast, when evaluating a challenge to the factual sufficiency of the evidence, we view all the evidence without the prism of "in the light most favorable to the prosecution" and set aside the verdict only if it is "so contrary to the overwhelming weight of the evidence to be clearly wrong and unjust." *Johnson v. State,* 23 S.W.3d 1, 6–7 (Tex.Crim.App.2000). This concept embraces both "formulations utilized in civil jurisprudence, i.e., that evidence can be factually insufficient if (1) it

is so weak as to be clearly wrong and manifestly unjust or (2) the adverse finding is against the great weight and preponderance of the available evidence." *Id.* at 11. Under this second formulation, the court essentially compares the evidence which tends to prove the existence of a fact with the evidence that tends to disprove that fact. *Jones v. State*, 944 S.W.2d 642, 647 (Tex.Crim.App.1996). In conducting the factual-sufficiency review, we must employ appropriate deference so that we do not substitute our judgment for that of the fact finder. *Id.* at 648. Our evaluation should not intrude upon the fact finder's role as the sole judge of the weight and credibility given to any witness's testimony. *Cain v. State*, 958 S.W.2d 404, 407 (Tex.Crim.App.1997).

Although appellants assign error as to the legal and factual sufficiency of the evidence supporting the findings that they intended to defraud the purchasers of the 1994 debentures, appellants' argument, record citations, and authorities do not address their intent to defraud. Therefore, appellants have waived error as to the sufficiency of the evidence to support the jury's findings as to intent to defraud. *See* Tex.R.App. P. 38.1(h); *Vuong*, 830 S.W.2d at 940; *King*, 17 S.W.3d at 23.

Even if appellants had not waived error, we still would conclude that there was legally and factually sufficient evidence to support the jury's findings that appellants intentionally failed to disclose to the complainants one or more of the Material Facts for the purpose of inducing the complainants to purchase the 1994 debentures. The fact finder determines intent from all the facts and infers intent from the conduct and circumstances surrounding those facts. *See Williams v. State*, 688 S.W.2d 486, 488 (Tex.Crim.App.1985); *Fisher v. State*, 803 S.W.2d 828, 831 (Tex. App.-Dallas 1991, pet. ref'd). The record

contains ample evidence to support the jury's findings that the failure to disclose one or more of the Material Facts was intentional, including the following:

- misrepresentations to purchasers of the 1992 debentures regarding the security of their investment;
- appellants' knowledge of the deteriorating financial condition of the Murchison companies;
- actions by appellants to take two large bonds that had dropped in value "off the books" through sales that were subject to repurchase agreements and that actually increased the company's liabilities;
- steps by Burrell to conceal the existence of the repurchase agreement as to the 9424–H bond by taking a letter confirming this agreement away from James Arnold and by refusing requests to confirm this agreement in writing;
- misstatements about the security of the 1994 debentures;
- statements by Burrell that "everything was going great" and that the proceeds of the 1994 debentures would be used to buy securities; and
- appellants' refusal to supply purchasers of the 1994 debentures with more current financial information, even though appellants had seen more recent monthly reports showing a deteriorating financial situation.

Thus, notwithstanding appellants' waiver of their legal and factual sufficiency issues, the record contains legally and factually sufficient evidence to support the jury's findings of appellants' intentional failure to disclose. *See Bridwell v. State*, 804 S.W.2d 900, 903–04 (Tex.Crim.App.1991) (holding that evidence was sufficient to support conviction under Tex.Rev.Civ.Stat. Ann. art. 581–29(C) for intentional failure

to disclose material facts); *Gant*, 814 S.W.2d at 447–50 (holding evidence sufficient to support securities-fraud conviction).

Under these issues, appellants make various arguments that go beyond the sufficiency of the evidence to support the findings of intentional failure to disclose. In the interest of justice, we examine these assertions to see if they challenge the sufficiency of the evidence in other respects. Regarding the first Material Fact, appellants assert there was no evidence that the proceeds from the sales of the 1992 debentures were used for anything other than the expansion of the company, that interest on these debentures was paid until 1994, and that the statute of limitations bars any allegation of fraud as to the sale of these debentures. These assertions are not relevant to the sufficiency of the evidence supporting intentional failure to disclose as to the first Material Fact. Further, the indictments in this case do not charge appellants with fraud in the sale of the 1992 debentures.

■ As to the second Material Fact, appellants assert the evidence did not show that they knew of operating losses sustained by the company from January through July of 1994, because the company still had positive retained earnings, even in the face of losses in the first half of 1994. Appellants assert the problem arose when James Arnold did not fill out the proper form to document the repurchase agreement on one of the bonds he sold. These arguments have no merit. Positive retained earnings do not change the fact that the company was experiencing operating losses. There is sufficient evidence in the record—for example, the testimony of Donald Katz—that appellants were aware of the operating losses in 1994.

■ As to the third Material Fact, appellants assert there was no evidence that

purchasers of the 1994 debentures relied on the fact that the company held an inventory of securities and that there was evidence that the principal source of income for Investment Bankers during 1994 was the sale of collateralized mortgages. These assertions are not relevant to the third Material Fact. Reliance by the purchasers of the 1994 debentures is not an element of this offense. *See* TEX.REV.CIV. STAT. ANN. art. 581–29(C); *Birchfield*, 401 S.W.2d at 828 (holding that TEX.REV.CIV. STAT. ANN. art. 581–29(C) does not require proof of reliance by the investor on defendant's fraud).

■ As to the fourth Material Fact, appellants assert there was no evidence the company used out-of-date financial statements to influence the purchasers of the 1994 debentures. There was evidence that the 1993 financial statements were part of the company's brochure used to promote the sale of the 1994 debentures. There was sufficient evidence the Murchisons failed to disclose to the complainants (1) the deterioration in the financial condition of the company in the first quarter of 1994; (2) the outdated nature of the 1993 financial statements in light of the company's true financial condition at the time it sold the debentures; and (3) that the company needed the proceeds from the debentures to meet ordinary operating expenses. The evidence was sufficient to show the failure to disclose this information to the complainants was material. Consequently, appellants' arguments fail.

As to the fifth Material Fact, appellants assert there was no evidence that the company was restricted from using the proceeds of the debenture sales to pay the holders of the 1992 debentures. Any lack of restrictions on the use of the proceeds is not relevant to the sufficiency of the evidence showing that appellants intentionally

failed to disclose that the revenues from the sales of the 1994 debentures were needed for the purposes stated in the fifth Material Fact. Appellants also assert that there was no evidence any of these proceeds were used for appellants' personal expenses. However, David Pilant testified that some of the proceeds from the sales of the 1994 debentures were used to cover appellants' personal expenses.

Under the fifth and sixth issues, appellants quote a statutory definition of deception, but they never explain how this definition relates to the sufficiency of the evidence in a securities-fraud case. Appellants also assert that they never represented to the complainants that Treasuries would be used as collateral or security for the 1994 debentures. This assertion overlooks testimony that Burrell told salesman Ed Hiers the proceeds would be placed in Treasuries held as collateral. Moreover, the record contains testimony that Burrell told a purchaser of a 1994 debenture that it would be backed up by Treasuries.

Having found appellants' various arguments lack merit, we overrule appellants' third, fourth, fifth, and sixth issues.

**Was there factually sufficient evidence to show that Richard was liable under the law of parties?**

In their seventh, eighth, and ninth issues, appellants assert the evidence was factually insufficient to show the following: (1) Richard had knowledge of the day-to-day management decisions of Murchison Group and Investment Bankers; (2) Richard was acting as a party to the offense; and (3) Richard was criminally responsible for an offense committed by the conduct of another.

Richard is criminally responsible as a party to an offense either by his own conduct or by the conduct of another for which he is criminally responsible, or by

both. *See* TEX. PEN.CODE ANN. § 7.01(a). Richard is criminally responsible for an offense committed by Burrell if Richard, acting with intent to promote or assist the commission of the offense, solicited, encouraged, directed, aided, or attempted to aid Burrell to commit the offense. *See id.* § 7.02(a)(2).

 In order to establish liability as a party, the State must show that, at the time of the commission of the offense, the parties were acting together, each contributing in some way to the execution of their common purpose. *See Ex parte Welborn*, 785 S.W.2d 391, 394 (Tex.Crim.App. 1990). An agreement of the parties to act together in a common design can seldom be proved by direct evidence, and the fact finder may rely on the action of the parties, showing by either direct or circumstantial evidence an understanding and common design to commit the offense. *See id.* The court may examine events occurring before, during, and after the commission of the offense. *See id.*

In support of their arguments, appellants cite their affidavits that were admitted in evidence. In his affidavit, Burrell states he was left in charge of the day-to-day operations due to Richard's illness. According to Burrell's affidavit, Richard and Burrell did not discuss the repurchase agreements regarding the 1668S and 9424–H bonds because of Richard's illness. In his affidavit, Richard recounts the ailments he and his wife experienced during the relevant time period. According to Richard, his wife had chronic fatigue syndrome, and he was taking medication for severe anxiety. As a result of these conditions, Richard claims he turned over his management responsibilities to Burrell. Appellants also cite testimony that Richard denied the existence of the repurchase

agreements regarding the 1668S and 9424–H bonds.

■ After applying the appropriate standard of review, we conclude the evidence was factually sufficient to show Richard was liable under the law of parties. There was evidence of the following: (1) Burrell and Richard both attended and participated in the initial meeting spelling out the purpose and details of the sales of the 1994 debentures; (2) Burrell and Richard presented the sales representatives with a booklet, including the 1993 financial statement, to be used to promote the 1994 debentures; (3) Richard participated in discussions regarding the 1994 debentures with at least one purchaser; (4) when James Arnold, on behalf of purchasers of the 9424–H bond, asked Richard and Burrell for written confirmation of the repurchase agreement, they did not provide it and, instead, Richard told Arnold to tell the customers, "to sit tight and don't be nervous, just to hang in there;" and (5) when Dale Hearn, accompanied by James Arnold, approached Richard and expressed concerns over the propriety of the sales of the 1668S and 9424–H bonds, Richard responded that "he understood why [he] was concerned, but this was a gray area."

The evidence in the record shows Richard had been a part of the companies since their creation and that he participated in the sales of the 1992 debentures and in the meeting in which the 1994 debentures were presented to the sales representatives. During and after the sales of the 1994 debentures, Richard participated in efforts to ensure that the company's sales representatives and customers remained confident. Richard participated in the

company's refusal to confirm one of the repurchase agreements in writing. Richard's response to Dale Hearn indicates that Richard was aware of and had considered the terms of the sales of the 1668S and 9424–H bonds. Regardless of Richard's knowledge of the day-to-day operations, the evidence was factually sufficient to show that Richard, acting with intent to promote or assist the commission of the offense, solicited, encouraged, directed, aided, or attempted to aid Burrell to commit the offense. *See Jarnigan v. State*, 57 S.W.3d 76, 88–89 (Tex.App.-Houston [14th Dist.] 2001, pet. ref'd) (finding factually sufficient evidence to support conviction based on the law of parties). Accordingly, we overrule appellants' seventh, eighth, and ninth issues.

**Did the jury charge violate appellants' constitutional right to a unanimous verdict?**

■ In their tenth issue, appellants assert the trial court erred in refusing appellants' requested jury instruction that, to convict, all jurors must unanimously agree that appellants intentionally failed to disclose at least one of the five Material Facts listed in the jury charge.[3] Appellants assert the jury charge violated their right under the Texas Constitution to have the jury return a unanimous verdict of guilt. *See* TEX. CONST. art. V, § 13; *Molandes v. State*, 571 S.W.2d 3, 4 (Tex.Crim.App.1978) (stating that defendants in felony criminal cases have right to a unanimous verdict of guilt under TEX. CONST. art. V, § 13). Under the applicable statutes, all of the criminal conduct with which appellants were charged constitutes a single offense. Because it is proper to charge the jury in the

---

3. The trial court gave separate jury charges for Burrell and Richard. These charges were substantially similar. Because there was no material difference between these two charges for the issues presented in this ap-

peal, and for ease of reference, we refer throughout this opinion to the "jury charge," even though there were actually two jury charges in the trial court.

disjunctive as to multiple manner and means for the commission of a single offense, we conclude the jury charge in this case did not violate appellants' right to a unanimous verdict under the Texas Constitution. *See Francis v. State*, 36 S.W.3d 121, 122–24 (Tex.Crim.App.2000); *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim.App.1991).

 Alternate manner and means of committing a single offense may be charged in the same indictment. *Kitchens*, 823 S.W.2d at 258. Even if the indictment alleges different means of committing the offense in the conjunctive, it is still proper to charge the jury on those alternatives in the disjunctive. *See Kitchens*, 823 S.W.2d at 258; *Gant*, 814 S.W.2d at 454 (holding trial court did not err in charging jury in disjunctive on different means of committing securities fraud). Where alternative theories of committing the same offense are submitted to the jury disjunctively, it is proper for the jury to return a general verdict if the evidence is sufficient to support a finding under any of the theories submitted. *See Kitchens*, 823 S.W.2d at 258. There is no requirement that the jury designate which of the alternative means of committing the offense they found to have been proven. *See id.*

Appellants rely on *Francis v. State* to support their argument that allowing conviction without consensus as to any of the Material Facts violated their rights under the Texas Constitution. *See Francis*, 36 S.W.3d at 122–25. In *Francis*, the Court of Criminal Appeals reversed the defendant's conviction on a single charge of indecency with a child because the jury charge impermissibly allowed a non-unanimous verdict. *See id.* at 122–25. The Court of Criminal Appeals stated that submitting alternate theories of committing a single offense in the jury charge does not violate a defendant's right to a unanimous

jury verdict. *See Francis*, 36 S.W.3d at 123–24; *see also Kitchens*, 823 S.W.2d at 257–58. On the other hand, the *Francis* court held that submitting more than one offense to the jury in the disjunctive violated the defendant's right to a unanimous jury verdict. *See Francis*, 36 S.W.3d at 124–25. Therefore, this court must determine whether the charge in this case submitted more than one offense, so as to violate appellants' right to a unanimous jury verdict.

The Texas Securities Act states that "[w]hen amounts are obtained in violation of this Act under one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense." *See* TEX.REV.CIV.STAT. ANN. art. 581–29–2 (Vernon Supp.2002). The indictment alleged, and the jury found, that appellants obtained money in violation of article 581–29 under one scheme or continuing course of conduct. *See id.* Under the plain meaning of this statute and under the indictments, each appellant was properly charged and tried for only one offense—intentionally failing to disclose to the complainants a material fact or facts in violation of article 581–29(C) under one scheme or continuing course of conduct. *See* TEX.REV.CIV. STAT. ANN. arts. 581–29, 581–29–2. The jury unanimously found that appellants intentionally, under one scheme and continuing course of conduct, directly or indirectly, sold the 1994 subordinated debentures to the complainants. The jury also unanimously found that appellants directly or indirectly engaged in fraud relating to these sales by intentionally failing to disclose to the complainants one or more of the Material Facts for the purpose of inducing the complainants to buy the debentures. Therefore, the five Material Facts listed in the court's charge

were alternative manner and means of committing the same offense relating to the sale of the 1994 debentures, and the jury charge did not violate appellants' right to a unanimous jury verdict. *See Francis*, 36 S.W.3d at 123–24; *Kitchens*, 823 S.W.2d at 257–58.

The holding in *Francis* does not govern this case. In *Francis*, though the two incidents of indecency with a child were charged together in a single indictment, these incidents were two separate offenses. *See Francis*, 36 S.W.3d at 123–25. In this case, however, each indictment charged only one offense. *See* Tex.Rev.Civ. Stat. Ann. arts. 581–29, 581–29–2. The *Francis* case confirms prior cases holding that it is proper to charge the jury with alternative manner and means of committing a single offense. *See Francis*, 36 S.W.3d at 123–25.

Although not exactly on point, the *Gant* case supports our ruling on appellants' tenth issue. In *Gant*, the defendant was charged with securities fraud under article 581–29(C) as to four different investors. *See* Tex.Rev.Civ.Stat. Ann. art. 581–29(C); *Gant*, 814 S.W.2d at 447 & n. 3. The opinion in *Gant* indicates that each indictment alleged the same fraudulent conduct by the defendant and that this conduct included two misrepresentations and the intentional failure to disclose two different facts. *See Gant*, 814 S.W.2d at 447–48, 452–53 & n. 3. In *Gant*, the court rejected the appellant's assertion that the trial court erred in charging the jury in the disjunctive as to this alleged fraudulent conduct when the indictments alleged this conduct in the conjunctive. *See id.* at 453. The *Gant* case does not discuss this issue in detail, and there is no indication that *Gant* involved a challenge based on the right to a unanimous jury verdict. *See id.* Nonetheless, *Gant* does indicate that it is proper to charge the jury in the disjunc-

tive as to alternative theories of fraud in a securities-fraud case under article 581–29(C). *See id.*

There is further support for our disposition of the tenth issue in the Texas Court of Criminal Appeals cases applying the aggregate-theft provision of the Texas Penal Code, which contains language substantially similar to article 581–29–2. *See* Tex. Pen.Code Ann. § 31.09; Tex.Rev.Civ. Stat. Ann. art. 581–29–2; *Dickens v. State*, 981 S.W.2d 186, 188 (Tex.Crim.App. 1998); *Lehman v. State*, 792 S.W.2d 82, 84–86 (Tex.Crim.App.1990); *Graves v. State*, 795 S.W.2d 185, 187 (Tex.Crim.App. 1990). The *Dickens* court held that the unambiguous language of the aggregate-theft statute provides for the aggregation of multiple thefts into a single offense, that aggregate theft is one offense, and that each subsidiary theft is a component of the single offense of aggregate theft. *See Dickens*, 981 S.W.2d at 188. The *Graves* court held that the aggregate-theft statute constitutes one offense consisting of two or more incidents of theft. *See Graves*, 795 S.W.2d at 187. The *Graves* court also held that this statute creates a separate offense and defines conduct for purposes of jurisdiction, punishment, and statute of limitations. *See id.*

The *Lehman* court approved a jury charge in an aggregate-theft case that allowed the jury to convict if it found that the defendant committed one or more of the six alleged thefts under one scheme and continuing course of conduct, as long as the total value of money obtained, if any, was more than $750 and less than $20,000. *See Lehman*, 792 S.W.2d at 83–87. The *Lehman* court stated that the six alleged thefts were alternative "manner and means" that were properly pleaded in the conjunctive in the indictment and charged in the disjunctive to the jury. *See*

*id.* If the jury need not unanimously agree as to which of these six thefts were committed by an aggregate-theft defendant, then there is no reason why the jury should be required to unanimously agree as to which of the Material Facts the appellants intentionally failed to disclose. *See id.*

Appellants also rely on two cases from the United States Court of Appeals for the Fifth Circuit. *See United States v. Holley,* 942 F.2d 916 (5th Cir.1991); *United States v. Gipson,* 553 F.2d 453 (5th Cir.1977). These cases involve the Federal Constitution, rather than the Texas Constitution, and are not binding on this court. *See Hulit v. State,* 982 S.W.2d 431, 436–37 (Tex.Crim.App.1998); *Vaughn v. State,* 931 S.W.2d 564, 568 & n. 5 (Tex.Crim.App. 1996). The *Holley* case does not help appellants because, in that case, the trial court charged the jury in the disjunctive as to two separate offenses, which distinguishes *Holley* from the case at hand. *See Holley,* 942 F.2d at 925–29. The *Gipson* case offers no support either. The Fifth Circuit has distinguished *Gipson,* and a four-justice plurality of the United States Supreme Court has rejected its unanimity analysis. *See Schad v. Arizona,* 501 U.S. 624, 633–39, 111 S.Ct. 2491, 2498–2501, 115 L.Ed.2d 555 (1991) (plurality opinion) (rejecting *Gipson*'s unanimity analysis); *United States v. Bolts,* 558 F.2d 316, 326 n. 4 (5th Cir.1977) (distinguishing *Gipson* as involving facts where trial court expressly instructed the jury that a non-unanimous verdict was permissible); *see also State v. Jennings,* 216 Conn. 647, 583 A.2d 915, 923–24 (1990) (holding that *Bolts* limited *Gipson* to cases in which the trial court expressly instructed the jury that a non-unanimous verdict was permissible). We decline to adopt *Gipson*'s analysis for the determination of appellants' challenge under the Texas Constitution.

Because the alternative Material Facts listed in the jury charge were alternative manner and means of committing a single offense of securities fraud, the jury charge in this case did not violate appellants' right to a unanimous jury verdict under the Texas Constitution. *See* Tex. Const. art. V, § 13; Tex.Rev.Civ. Stat. Ann. arts. 581–29, 581–29–2; *Francis,* 36 S.W.3d at 123–25; *Kitchens,* 823 S.W.2d at 258; *Gant,* 814 S.W.2d at 454. Therefore, we overrule appellants' tenth issue.

**Did the trial court become an advocate for the State during trial by allegedly making numerous comments that conveyed its opinion of the professionalism of appellants' counsel and by ruling on several hearsay objections without asking the State for a response?**

 In their eleventh and twelfth issues, appellants assert the trial court erred by making numerous comments that conveyed its opinion of the professionalism of appellants' trial counsel and by ruling on hearsay objections without asking the State for a response. We conclude that appellants did not preserve error as to these issues. Moreover, we find these issues do not present fundamental error.

The trial court suggested *sua sponte* that it instruct the jury not to consider the trial court's comments for any purpose whatsoever. Appellants agreed, and the trial court gave the following instruction:

> Yesterday afternoon I guess probably, you know, you don't pay much attention sometimes to what you say. I made a couple of comments that might have been offensive to one or both sides, might have—hopefully wasn't offensive to y'all, but if it was I apologize for it. Please know that I have no—a judge has no business whatsoever, and nor do I have, feelings one way or the other in a trial of a case, and if I ever make any comments inadvertently—of course, y'all

are not paying attention to it whatsoever because that's not the judge's function.

Although appellants point to a number of comments of the trial court that they claim were erroneous, they cite only two objections. Appellants claim the following objections preserved error:

> On behalf of the defendants we would like to interpose an objection, and again with no disrespect for the Court but in discharging our obligations to our client.

> During the course of the proceedings the Court has asked questions sua sponte. We should like to note our objection to the procedure. We believe that it constitutes comments on the weight of the evidence. We request that the jury be instructed again that the Court has no opinion one way or the other and that any comments made by the Court are not intended to reference any opinion by the Court, but we believe that it compromises our position in the case, that it constitutes a comment on the weight of the evidence.

> We should like for the record to reflect our objection and continuing objection to the procedure. We request the jury instruction, and of course we move for a mistrial.

> . . .

> Your Honor, again as a housekeeping matter, we request that the jury be instructed when they return that during the course of this trial the Court has made various comments or may have made certain comments. We request that the jury be instructed that those comments are not to be interpreted by the jury as having any effect on the evidence if they are the sole judges of the facts in this case, and the Court did not intend by participation in the matter to inject any opinion regarding the evidence or in any way to influence the

opinion of the jury, and we ask that the jury be so instructed when they return.

In its instruction to the jury, the trial court did not specify or identify any particular comments from the previous afternoon, nor did the court indicate that its instruction was to be applied to any specific statements. In their two objections, appellants did not identify which of the trial court's comments were the subject of their objections, nor did they object promptly after any comment of the court. They made one of these objections at the beginning of a trial day in the morning, and the other objection after a lunch recess before testimony started in the afternoon. Generally, to preserve a complaint for appellate review, a party must make a timely request, objection, or motion with sufficient specificity to apprise the trial court of the complaint. *See* TEX.R.APP. P. 33.1(a); *Saldano v. State*, 70 S.W.3d 873, 886–87 (Tex.Crim.App.2002). Appellants' two objections were neither timely nor specific. *See* TEX.R.APP. P. 33.1(a); *Saldano*, 70 S.W.3d at 886–87.

Nonetheless, appellants assert the trial court's allegedly improper comments constitute fundamental error because they violated their right to a fair trial by an impartial jury. In these comments, appellants claim the trial court: (1) responded to appellants' hearsay objections by stating that the testimony was not offered for the truth of the matter asserted and that the objection was overruled; (2) stated, "Let's move along;" (3) allowed the State's expert to testify but excluded most of the testimony of appellants' expert, Dr. Lehrer; (4) lodged objections to the admissibility of Dr. Lehrer's testimony and excluded most of it without any objection from the State; (5) expressed an opinion as to the credibility of the witnesses and the professionalism of appellants' trial counsel; (6) stated that the witness already had answered the

question asked; (7) instructed counsel not to argue with the witness; and (8) told a witness to answer a question "if you remember." [4] Even though appellants did not timely and specifically object to these comments or otherwise preserve error in the trial court, we may take notice of any fundamental errors affecting substantial rights. *See* TEX.R. EVID. 103(d); *Jasper v. State*, 61 S.W.3d 413, 420 (Tex.Crim.App. 2001).

■ It is proper for a trial court to interject to correct a misstatement or misrepresentation of previously admitted testimony, to clear up a point of confusion, or to expedite the trial. *See Jasper*, 61 S.W.3d at 420–22; *Singleton v. State*, 91 S.W.3d 342, 350 (Tex.App.-Texarkana 2002, no pet. h.). Any comments relating to the exclusion of Dr. Lehrer's testimony took place outside the jury's presence. Contrary to appellants' assertion, the State did object to the admission of Dr. Lehrer's testimony. The trial court's admission of the State's expert and exclusion of most of Dr. Lehrer's testimony is not fundamental error. Appellants have not provided this court with any record citations to support their assertion that the trial court expressed an opinion as to the credibility of the witnesses or the professionalism of appellants' trial counsel. Further, a trial court's irritation at the defense attorney does not translate to an indication as to the court's views about the defendant's guilt or innocence. *See Jasper*, 61 S.W.3d at 420–22. The trial court has broad discretion to expedite and maintain control over the trial. *See id.* None of the trial court's comments rose to such a level as to bear on the presumption of innocence or vitiate the impartiality of the jury. *See Jasper*, 61 S.W.3d at 420–22; *Singleton*, 91

S.W.3d at 350–51. Because none of the trial court's comments was fundamental error, appellants' failure to properly object in the trial court waives error as to the eleventh and twelfth issues. *See Jasper*, 61 S.W.3d at 420–22; *Nelson v. State*, 661 S.W.2d 122, 123–24 (Tex.Crim.App.1983); *Singleton*, 91 S.W.3d at 350; *Lape v. State*, 893 S.W.2d 949, 953 (Tex.App.-Houston [14th Dist.] 1994, pet. ref'd).

Appellants also rely on *Blue v. State*, 41 S.W.3d 129 (Tex.Crim.App.2000) (plurality op.). Because there is no majority opinion in *Blue*, it is not binding precedent. *See Pearson v. State*, 994 S.W.2d 176, 177 n. 3 (Tex.Crim.App.1999). Even if it were, it would not affect our analysis. As Judge Keasler's concurring opinion in *Blue* indicates, the trial court's remarks in *Blue* reasonably could be interpreted as a predetermination of Blue's guilt, thus implicating the right to an impartial trial court. *See Blue*, 41 S.W.3d at 135–39 (Keasler, J., concurring). The trial court's comments in this case are not of this nature. Therefore, *Blue* would not apply to the facts of this case, even if it were binding precedent. *See Jasper*, 61 S.W.3d at 420–22; *Blue*, 41 S.W.3d at 129–135. Accordingly, we overrule appellants' eleventh and twelfth issues.

## IV. CONCLUSION

The trial court did not abuse its discretion by sustaining the State's objection that Dr. Lehrer's testimony was not relevant. The trial court correctly refused appellants' mistake-of-fact instruction because, viewed in a light favorable to appellants, the evidence did not raise an issue regarding an alleged mistaken belief by

---

4. Several items listed in the appendix to appellants' brief as allegedly improper comments were made outside of the presence of the jury. These comments could not have affected appellants' right to an impartial jury trial.

appellants that negates the culpable mental state as to appellants' failure to disclose. Appellants' arguments under their issues attacking the legal and factual sufficiency of the evidence lack merit. Because the alternative Material Facts listed in the jury charge were different manner and means of committing a single offense, the jury charge did not violate appellants' constitutional right to a unanimous verdict of guilt. Appellants did not specifically and timely object to any of the trial court's allegedly improper comments, and because these comments are not fundamental error, appellants waived any error as to these comments. For these reasons, we overrule all of appellants' issues and affirm both of the trial court's judgments.