**Affirmed and Memorandum Opinion filed January 28, 2020.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-18-00058-CR

---

**JAMES WARR, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 299th District Court
Travis County, Texas
Trial Court Cause No. D-1-DC-15-900044**

---

## M E M O R A N D U M   O P I N I O N

Appellant James Warr appeals his convictions for misapplication of fiduciary property, theft, securities fraud, and money laundering. Appellant challenges the sufficiency of the evidence to support the convictions and asserts jury-charge error. We affirm.

### I. FACTUAL AND PROCEDURAL BACKGROUND

For decades before appellant's convictions, he worked as a stock broker and a securities agent licensed through the Texas State Securities Board. At one time,

appellant also held licenses as both a securities broker and a mortgage broker.

In the spring of 2010, appellant filed paperwork with the Texas Secretary of State to create several business entities, including Warr Investment Group. Appellant did not register himself to sell securities. Nor did Warr Investment Group register with the Texas Securities Board to sell securities or to serve as an investment advisor, dealer, or agent.

*The Program*

Working through the Warr Investment Group, appellant offered a program through which individuals would deposit an initial amount of $100 or more and pay a nonrefundable $50 fee for registration and processing (the "Program"). Under the Program, the funds provided by the individuals whom appellant called "affiliates" would be combined with funds provided by others and deposited into an escrow account. Warr Investment Group then would use these funds to purchase income-producing real property or discounted real-estate notes. These assets then would be placed in an irrevocable trust, and those contributing funds would be named as irrevocable beneficiaries of the trust. Warr Investment Group was to earn twelve percent interest on these transactions, keep four percent as its profit, and then distribute the remaining eight percent to those who had contributed the funds. Under the Program, investors would be entitled to receive a monthly distribution of interest, but could elect to forego the monthly distribution and instead allow the interest to compound at eight percent on a monthly basis. Warr Investment Group guaranteed the full payment of the eight-percent interest.

"Affiliates," the term appellant used to refer to investors participating in the Program, would sign an "Affiliate Contract" and a separate document entitled "Affiliation Terms and Conditions." The following schematic depicting how the Program worked was among the advertising and promotional materials appellant used to attract investors:



Appellant secured signed Affiliate Contracts with many individuals who sent funds (through checks or wire transfers) to Warr Investment Group.

*Advertising and Promotional Materials*

Appellant marketed the Program through various means. He posted ads on Craigslist. He recorded and posted on Warr Investment Group's website videos in which he pitched the Program. He made personal sales pitches to individuals at amateur investment club meetings. He purchased radio time and operated a call-in show during which he gave investment advice.

Appellant contracted with EBQuickstart, a marketing and advertising agency that called on businesses to target potential customers. Across all of these platforms, appellant described the Program as a pooling of money to purchase real-estate notes or loans, with eight percent guaranteed return to those contributing funds, and any additional interest going back to the business to cover operating expenses and profits.

*Emergency Cease-and-Desist Order*

Appellant's Craigslist ads sparked suspicion within the Texas State Securities Board that appellant might be selling unregistered securities. As part of the investigation that followed, Texas State Securities Board investigator Rani Sabban set up an undercover telephone call with appellant. Posing as a potential client, the investigator listened to appellant's pitch and then questioned appellant about the details of the Program. The Texas State Securities Board then sought and received an emergency cease-and-desist order against Warr Investment Group, LLC, Mark Cuba (Director of Sales of Warr Investment Group, LLC) and appellant. Under the terms of the order appellant and the other respondents were ordered to "cease and desist," among other things "offering for sale" unexempt securities not yet registered with the Securities Commissioner, "acting as securities dealers or agents" until becoming registered to do so or doing so would be

pursuant to an exemption, offering securities in Texas "through an offer containing a statement that is materially misleading or otherwise likely to deceive the public," and "engaging in any fraud" in connection with the sale of any security in Texas.

*Appellant's Activities After Cease-and-Desist Order in Effect*

While the cease-and-desist order remained in effect, appellant continued to accept funds from existing investors, solicit new investors for the Program, and accept funds from new investors seeking to participate in the Program. Appellant did not disclose the existence of the cease-and-desist order to any of his established investors or to any new investors.

After the cease-and-desist-order went into effect, appellant created a second company, Warr International Group, and filed the required paperwork with the Texas Secretary of State. Warr Investment Group had been operating using the acronym "WIG" and appellant's new company — Warr International Group — had the same acronym. Appellant continued to use the "WIG" acronym in running his business, modifying the text of the Affiliate Agreement to omit references to "investments" but otherwise keeping the contents of the written agreement. Appellant continued to advertise essentially the same product using the same platforms. Warr Investment Group had received approximately $1.1 million from investors participating in the Program. Of that amount, $951,000 was raised before the cease-and-desist order and the remaining $190,000 was raised afterward.

A prospective client informed EBQuickstart, the marketing company appellant had been using to promote the Program, of the cease-and-desist order. EBQuickstart terminated its relationship with appellant. Before ending the relationship, EBQuickstart had forwarded to appellant a lead involving Ginny's Printing, a local business. Appellant set up a meeting with the company's Chief Financial Officer, Cheryl Degan. Before her meeting with appellant, Degan became aware of the cease-and desist order and notified the Texas State Securities

5

Board. When she met with appellant, Degan recorded their conversation. During the conversation, appellant vaguely acknowledged the involvement of the State Securities Board and took the position that the Program was not a security. Appellant told Degan that he would be able to solicit investments again beginning October 15.

*Receivership*

Warr Investment Group went into receivership on January 6, 2011. Gregory Milligan, who served as the receiver, determined that appellant had not been operating the business as represented. Milligan found client funds deposited directly into Warr Investment Group's operating accounts as well as client funds deposited into accounts entitled "escrow" but not held by a third party. Nearly half of the client funds had been used for personal and operating expenses. Based upon Milligan's review of the notes purchased, the average interest rate was 8.788 percent in November 2010 and 8.1 percent in January 2011. Given the lack of spread between the promised return to investors (eight percent) and the actual interest rates garnered by the notes, and the discovery that only about half of the client funds had been used to purchase loans or notes, it seemed it would be impossible to pay the guaranteed rate to investors and successfully operate the company.

Warr Investment Group purchased real-estate notes with about half of the client funds. Through the receivership, the investors received some money back in proportion to the funds they invested. None of the investors were made whole.

*Indictment*

A Travis County grand jury indicted appellant for the first-degree felony offenses of misapplication of fiduciary property, theft, securities fraud, and money laundering. Appellant entered a plea of "not guilty" to each count. A jury trial followed.

*Trial*

At trial, the Securities Commissioner of the State Securities Board, Travis Iles, testified that the product appellant was selling through Warr Investment Group and Warr International Group was a security, either under the definition of an investment contract or evidence of indebtedness. Several of the appellant's investors testified at trial, each giving testimony to support the following:

- Appellant never disclosed the existence of the cease-and-desist order.
- Investors were not informed that their principal would be used for anything other than to purchase real-estate notes or loans.
- Appellant never disclosed that he used principal or the eight-percent return to cover operating or personal expenses of appellant or Warr Investment Group or Warr International Group.
- Investors were not informed that previously purchased notes were not generating sufficient income to meet the promised return.

Appellant's main defensive theories were that WIG's chief operating officer led him astray as to the performance of the business. Appellant claimed he believed the properties were making the returns he had claimed and that he had met with the Securities Board representatives, explained his understanding of the Program, and following the meeting, he believed he had addressed and allayed the Board's concerns.

Before the trial court charged the jury, appellant requested a mistake-of-fact instruction on three counts — misapplication of fiduciary property, theft by deception, and securities fraud. The trial court specifically ruled that the requested mistake-of-fact instruction failed to negate the culpable mental state as to securities fraud, and the trial court refused to give the instruction as to that count.

The jury found appellant guilty on all four counts and recommended as

punishment a fifteen-year sentence of confinement in the Institutional Division of the Texas Department of Criminal Justice on all four counts and a $10,000 fine on the theft count. The trial court sentenced appellant accordingly. Appellant now challenges his four convictions in this appeal.

## II. ISSUES AND ANALYSIS

In his first three issues, appellant asserts that the trial evidence is legally insufficient to support his convictions for misapplication of fiduciary property, theft by deception, and securities fraud. In his fourth issue, appellant asserts that the trial court erred in denying his requested mistake-of-fact instruction as to the securities-fraud offense. In his fifth issue, appellant asserts that this court must reverse the trial court's judgment as to the money-laundering offense if this court sustains the first three issues or the fourth issue.

**A.** **Is the evidence legally sufficient to support appellant's convictions for misapplication of fiduciary property, theft, and securities fraud?**

In evaluating a challenge to the sufficiency of the evidence supporting a criminal conviction, we view the evidence in the light most favorable to the verdict. *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). The issue on appeal is not whether we, as a court, believe the State's evidence or believe that appellant's evidence outweighs the State's evidence. *Wicker v. State*, 667 S.W.2d 137, 143 (Tex. Crim. App. 1984). The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). The jury "is the sole judge of the credibility of the witnesses and of the strength of the evidence." *Fuentes v. State,* 991 S.W.2d 267, 271 (Tex. Crim. App. 1999). The jury may choose to believe or disbelieve any portion of the witnesses' testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). When faced with conflicting evidence, we presume the jury resolved conflicts in favor of the prevailing party. *Turro v.*

8

*State*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993). Therefore, if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must affirm. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997).

### 1.    *Misapplication of Fiduciary Property*

In his first issue appellant challenges the legal sufficiency of the evidence to support his conviction for misapplication of fiduciary property. A person commits the offense of misapplication of fiduciary property if he intentionally, knowingly, or recklessly misapplies property he holds as a fiduciary in a manner that involves substantial risk of loss to the owner of the property or to a person for whose benefit the property is held. Tex. Pen. Code. Ann. § 32.45(b).  Warr was charged with misapplication of more than $200,000 from various investors.  The term "misapply" means "deal with property contrary to: (A) an agreement under which the fiduciary holds the property; or (B) a law prescribing the custody or disposition of the property." *Id*. § 32.45(a)(2).

The term "fiduciary" includes "any . . . person acting in a fiduciary capacity, but not a commercial bailee . . . and . . . an officer, manager, employee, or agent carrying on fiduciary functions on behalf of a fiduciary."[1] *Id*. § 32.45(a)(1).  The statute does not define what constitutes "acting in a fiduciary capacity"; the Court of Criminal Appeals has interpreted that phrase in accordance with its plain meaning. *See Berry v. State*, 424 S.W.3d 579, 583 (Tex. Crim. App. 2014). In *Berry v. State*, the high court stated that the plain meaning of "fiduciary" is "one who is required to act for the benefit of another person on all matters within the scope of their relationship." *Id*. (internal quotations omitted).  The *Berry* court

---

[1] The statute contains an exclusion from the "commercial bailee" exception but that exclusion is not an issue in this case. *See* Tex. Pen. Code. Ann. § 32.45(a).

noted that another definition for a "fiduciary" is "one who owes to another the duties of good faith, trust, confidence and candor," or, "[o]ne who must exercise a high standard of care in managing another's money or property." *Id*. (internal quotations omitted). According to the *Berry* court, a fiduciary relationship also may be described as "existing when one person justifiably reposes confidence, faith, and reliance in another whose aid, advice, or protection is sought in some matter," or when "good conscience requires one to act at all times for the sole benefit and interest of another with loyalty to those interests." *Id*. (internal quotations omitted). The *Berry* court stated that a fiduciary relationship commonly arises in these situations: "(1) when one person places trust in the faithful integrity of another, who as a result gains superiority or influence over the first, (2) when one person assumes control and responsibility over another, (3) when one person has a duty to act for or give advice to another on matters falling within the scope of the relationship, or (4) when there is a specific relationship that has traditionally been recognized as involving fiduciary duties, as with a lawyer and a client or a stockbroker and a customer." *Id*. at 583–84 (internal quotations omitted). The high court held that a person acts in a "fiduciary capacity" for purposes of the misapplication-of-fiduciary-property offense if the person's relationship with another is based not only on trust, confidence, good faith, and utmost fair dealing, but also on a justifiable expectation that the person will place the interests of the other party before the person's interest. *Id*. at 584. The Court of Criminal Appeals cited *Anderson v. State* as an example of a person acting in a fiduciary capacity within the meaning of the misapplication-of-fiduciary-property offense, characterizing *Anderson* as involving a "defendant [who] was [an] investment manager who received funds for [the] sole purpose of investing [the] funds in [a] limited partnership but instead spent [the] funds on personal legal fees and a car." *Id*. at 584, n.7; *see Anderson v. State*, 322 S.W.3d 401, 406–07 (Tex. App.—

10

Houston [14th Dist.] 2010, pet. ref'd).

In his first issue, appellant asserts that the evidence is legally insufficient to support a finding that appellant held the investors' funds as a fiduciary. Appellant does not challenge the sufficiency of the evidence as to any other element of this offense.

Travis Iles, the Securities Commissioner for the Texas State Securities Board, testified about the nature of a security and what constitutes an investment contract. According to Iles, an investment contract entails a transaction or a scheme in which one person pays money in a common enterprise with an expectation of profits and the expectation of realizing profits arises from the efforts of persons other than the individuals giving the money over to the promoter. Iles testified that the "pooling of the [investors' funds] . . . goes to the common enterprise portion [of the definition of an investment contract.]" Iles also testified that, for the purpose of determining whether a transaction constitutes a security, the use of words such as "loan" or "affiliate" do not control the determination. Instead, the nature of the transaction itself determines whether "security" status. In Iles's opinion the Program constituted an investment contract.

The trial evidence contains online postings by Warr Investment Group stating, "We are a local investment firm specializing in retirement and savings accounts. We can set up your account as a qualified or non-qualified plan." Viewing the evidence in the light most favorable to the verdict, the trial evidence would allow a reasonable trier of fact to find find beyond a reasonable doubt that appellant held himself out as an investment manager operating the Program and that the Program constituted an investment contract. Evidence shows appellant cultivated his relationships with the investors with the intent that they would place trust him. Under the Program, an investor's funds that were not returned to the

11

investor were supposed to be placed in an escrow account, and then combined with other investors' funds, and used to purchase real-estate notes paying guaranteed interest. Under the Program, title to the "purchased property" was to be held in trust for each investor. Trial evidence showed that investor funds were not deposited into third-party escrow accounts and that they were deposited into Warr Investment Group operating accounts. Evidence showed that approximately half of the investor funds were used for personal or operating expenses rather than for the purchase of loans or notes.

Appellant argues on appeal that his dealings with each of his customers were arms-length transactions designed for their mutual benefit and that his only promise was to pay eight-percent interest on the "loans" made to him. In his trial testimony, appellant characterized the transactions as "uncollateralized loans." The jury was free to disbelieve appellant's testimony regarding the substance and nature of the transactions. *See Turro*, 867 S.W.2d at 47; *Sharp*, 707 S.W.2d at 614.

Under the deferential standard of review, we conclude the trial evidence would allow a reasonable trier of fact to find beyond a reasonable doubt that appellant operated as an investment manager, who received funds with the purpose of investing the funds in real-estate notes or loans and who dealt with the funds contrary to an agreement under which he held the property. *See Berry*, 424 S.W.3d at 584, n.7; *Anderson*, 322 S.W.3d at 406–07. The trial evidence is legally sufficient to support a finding that appellant held the investors' funds as a fiduciary and that appellant intentionally, knowingly, or recklessly misapplied this property in a manner that involved substantial risk of loss to the owners of the property or to the persons for whose benefit the property was held. *See Berry*, 424 S.W.3d at 584, n.7; *Anderson*, 322 S.W.3d at 406–07. The evidence is legally sufficient to

support appellant's conviction for misapplication of fiduciary property. We overrule appellant's first issue.

## 2. Theft

In his second issue appellant challenges the legal sufficiency of the evidence to support his conviction for theft, asserting that appellant did not make any false promises or engage in deceptive conduct to convert money from the investors' control to his control. A person commits theft if the person intentionally or knowingly unlawfully appropriates property with the intent to deprive the owner of the property. Tex. Pen. Code. Ann. § 31.03(a). Appropriation of property is unlawful if it is without the owner's effective consent. Tex. Pen. Code. Ann. § 31.03(b). Consent is not effective if it is induced by deception or coercion. Tex. Pen. Code. Ann. § 31.01(3).

In Count II of the indictment, appellant was charged with "intentionally or knowingly unlawfully appropriat[ing] property . . . without the effective consent of said owners in that consent was induced by deception, to wit: (a) [appellant] created and confirmed by words and conduct false impressions of fact that were likely to affect the judgment of said owners in the transactions and [appellant] did not believe to be true, or (b) [appellant] failed to correct false impressions of fact that were likely to affect the judgment of said owners in the transactions, that [appellant] previously created and confirmed by words and conduct, and [appellant] did not at the time believe to be true, or (c) [appellant] promised performance that affected the judgment of said owners in said transactions that [appellant] did not intend to perform and knew would not be performed. This language from the indictment alleged three alternative manners and means and tracks three of the alternative definitions of "deception" under Penal Code section 31.01(1). *See* Tex. Pen. Code. Ann. § 31.01(1).

Evidence at trial showed that appellant misled the investors by (1) falsely

13

telling them that their funds would be kept in an escrow account; (2) failing to disclose that almost half of the invested funds were spent on operating or personal expenses rather than on the purchase of real-estate notes or loans; (3) failing to disclose the existence of the cease-and-desist order; and (4) failing to disclose that previous investments were not performing as promised.

Appellant argues the evidence is insufficient to support a conviction for theft by deception because appellant did not make any false promises or engage in deceptive conduct to convert the client funds. He says the alleged losses occurred in the context of a contractual relationship and argues that he did not intend to deprive the investors of funds at the times he took their money. Appellant blames the financial failures on his self-professed ineptitude and says he simply was unable to fulfill the terms of the contracts.

In reviewing the sufficiency of the evidence of theft alleged to have taken place in connection with the performance of a contract, we consider the events occurring before, during, and after the offense and we may rely on appellant's actions showing an understanding and common design to do the prohibited act. *Taylor v. State*, 450 S.W.3d 528, 536 (Tex. Crim. App. 2014). Where theft occurs in connection with a contract, the State must prove that the appropriation resulted from a false pretext, or fraud, and that the defendant intended to deprive the owner of the property at the time the property was taken. *Id*. at 536. Intent can be demonstrated by proof that the accused engaged in other similar, recent transactions. *See* Tex. Pen. Code. Ann. § 31.03(c)(1); *Johnson v. State*, 560 S.W.3d 224, 227 (Tex. Crim. App. 2018).

In *Taylor v. State*, the Court of Criminal Appeals concluded that the evidence was legally sufficient to support a conviction for theft by deception where a commercial sign installer entered into a contract with a retailer to install several signs. 450 S.W.3d at 530–31. The contract required an initial payment of half the

total construction and installation cost, with a second installment once the signs had been manufactured and were ready for shipment, and the final balance due upon completion of the installation. *Id.* at 531. The sign installer delayed installation indefinitely, got inadequate construction permits, convinced the retailer to pay the second installment, and still had not completed performance nearly four months after the original promised installation date. *Id.* at 532. The trial court permitted evidence of four other recent contractual obligations that the commercial sign installer had undertaken but failed to complete, and held that the evidence of the similar transactions helped establish the required criminal intent. *Id*. at 534. On appeal, the sign installer argued the evidence was insufficient to prove that he knew he would be unable to perform the promises made when he took the down payments.

On review, the Court of Criminal Appeals noted that the record contained facts that indicated some of the sign installer's conduct would seem circumstantially to dispel the inference that the sign installer knew that he would not perform. *See id.* at 539. Still, the high court held that the evidence of the "recent trend" of behavior where the sign installer would enter a contract, accept a substantial initial payment, unreasonably delay work, persuade the customer to make more installment payments, and then cease contact with the customer without fulfilling his contractual obligations, was legally sufficient to support the conviction for theft by deception. *See id.* at 538. According to the high court, these facts allowed the factfinder to rationally conclude that the sign installer's conduct was evasive and that he had a "*modus operandi* . . . to put on an *appearance* of intending to satisfy his contractual obligations while knowing he would not." *Id.* at 539.

We conclude the evidence at trial is legally sufficient to support a finding that that appellant intentionally or knowingly unlawfully appropriated funds by

15

deception with the intent to deprive the owners of the property. The record shows that appellant affirmatively misled and failed to disclose material information to the investors, and the investors relied on appellant's misleading statements in deciding to invest their funds with appellant. Viewing the evidence in the light most favorable to the verdict, we conclude the jury reasonably could have inferred that, at the time of each appropriation, appellant had no intention of fulfilling the contracts and so unlawfully deprived each client of the funds. *See id.* at 537–38.

*"Escrow Account" Representations*

In communicating with investors and potential investors about the Program, appellant made the following statements regarding the escrow account:

- Appellant represented to the investors that their funds initially would be held in an escrow account upon receipt.
- The Affiliate Agreements, for both iterations of WIG, state that lending deposits "will be held in the name of [WIG] in an Escrow account until used to purchase real estate notes."
- Appellant told Cheryl Degans, whom appellant believed to be a potential client, that funds would be deposited into an escrow account upon receipt.

The receiver, Greg Milligan, testified that an escrow account is one held by "an independent third party [with] a fiduciary duty to both parties in the transaction." Though appellant deposited investor funds into accounts he identified as "escrow," appellant and his companies — not a third party — controlled the accounts. The funds did not go solely to purchase notes or loans as appellant had represented but instead went to pay operating and personal expenses.

*"Pooling of Funds to Purchase Notes and Loans" Representations*

Appellant falsely held out to the investors that he would pool all investor funds and use all of the pooled funds to buy real-estate contracts or notes. Marketing material for Warr Investment Group proclaimed that "WIG pools all the

money and either buys real estate contracts or lends people the money to buy income producing property like rental homes." In reality, appellant spent only about half of the invested funds on real-estate notes or loans. The rest were used to pay operating or personal expenses — including payroll, rent, utilities, marketing, advertisements, meals, and a Mercedes automobile — or to pay other investors their monthly returns.

Appellant admitted at trial that he did not tell the investors that he was going to use their money for personal expenses or for operating expenses, or that he was going to use their money to pay other investors who had invested earlier. Several investors testified they would not have entrusted appellant with their money had they known he was not spending all of it on the real-estate notes or loans.

*Failure to Disclose Cease-and-Desist Order*

Shortly after issuance of the cease-and-desist order, appellant created a new business entity with a slightly different name and dubbed the new entity "Warr International Group" — a name strikingly close to Warr Investment Group and having the same acronym. The record contains testimonial evidence from many of the investors who confirmed that appellant never disclosed the existence of the cease-and-desist order. These investors testified that had appellant done so, they would not have entrusted their funds to him.

*Representations of Guaranteed Returns*

Appellant guaranteed an eight-percent return to all of the investors through his written promotional materials, his in-person pitches, his online video advertisements, his radio advertisements, and in the signed Affiliate Agreements. At the time of the receivership, the average rate of return on the notes was 8.1 percent. By the time the receivership concluded, the average rate of return was 8.788 percent. Receiver Milligan testified that the profit margin was too small to cover the necessary expenses and to pay investors the guaranteed eight-percent

17

return. Milligan further testified that it would not have been possible to pay an eight-percent return on the totality of the investors' funds when only about half of the funds were invested in real-estate notes.

Appellant never updated existing investors or told new investors that the investments were underperforming. Though appellant claimed he believed the Program was making money and that he would be able to meet his obligations, the record evidence shows appellant's awareness of these matters. The record contains evidence that appellant failed to disclose that the real-estate notes and loans were not generating sufficient revenue to meet the eight-percent return guarantee. Still, appellant argues the record contains insufficient evidence of criminal intent because he was seeking to perform on his contracts, he was doing what he told the investors he would do in that he used the "borrowed" money to buy real-estate notes, and that if he had had enough time to sell the notes already purchased, he might have been able to recover the full value of all the notes. Even if that were true, that would not erase appellant's actions in using investor funds for unauthorized expenditures rather than using them to purchase real-estate notes or loans and failing to disclose these uses to the investors. *See Baker v. State*, 986 S.W.2d 271, 276 (Tex. App.—Texarkana 1998, pet. ref'd) (noting that "[e]ven though there is undisputed evidence that [contractor] did perform a sizable portion of the overall work on the [contract], there is specific evidence that he took some of the funds for his own benefit and fraudulently concealed that they were not used for purposes of the contract," specifically ruling that this fact pattern was "a proper case for criminal prosecution," and finding evidence legally sufficient to support theft conviction). Though appellant had worked in the brokerage and securities business for decades and held certifications, he claimed that he did not understand what an escrow account meant. According to appellant, he believed the Program was working and running profitably, and he believed he was issuing promissory

18

notes rather than securities or investments. Appellant also testified that he thought he had resolved the concerns of the State Securities Board. It fell to the jury to decide whether to credit appellant's testimony or disregard some or all of it. *See Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) ("As factfinder, the jury is entitled to judge the credibility of witnesses, and can choose to believe all, some, or none of the testimony presented by the parties.").

In sum, viewing the record evidence in the light most favorable to the verdict, we conclude a reasonable trier of fact could find beyond a reasonable doubt that, at the time of each appropriation, appellant had no intention of fulfilling the contract with each investor. *See Taylor*, 450 S.W.3d at 537–38. Under the applicable standard of review, we conclude the record evidence would allow a rational trier of fact to find beyond a reasonable doubt that appellant intentionally or knowingly unlawfully appropriated the investors' property by inducing the respective owner's consent by deception, with the intent to deprive the investors of the property. *See Taylor*, 450 S.W.3d at 537–38; Tex. Pen. Code. Ann. §§ 31.01(1),(3), 31.03(a),(b). So, the record contains sufficient evidence to support the conviction for theft by deception. We overrule appellant's second issue.

### 3. Securities Fraud

In his third issue, appellant challenges the sufficiency of the evidence supporting his securities-fraud conviction, asserting that the evidence is insufficient to prove that he intentionally failed to disclose any of the four material facts alleged in the indictment.

The material facts a defendant is charged with failing to disclose under article 581-29(C) of the Revised Civil Statutes are alternate means or modes of committing the same offense. *See* Tex. Rev. Civ. Stat. Ann art 581-29; *Murchison v. State*, 93 S.W.3d 239, 257–59 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd)). Count III of the indictment, in relevant part, charged appellant with

19

commit[ing] fraud in connection with the sales and offers for sale of the securities by:

> a. Intentionally failing to disclose that previous investors' funds invested in the Warr Investment Program and the Warr International Program were used to pay the personal expenses of [appellant], said information being a material fact, or

> b. Intentionally failing to disclose that previous investors' funds invested in the Warr Investment Program and the Warr International Program were not used to purchase real estate notes or hard money loans, said information being a material fact, or

> c. Intentionally failing to disclose that the real estate notes or hard money loans purchased by [appellant] were not generating sufficient revenue to meet the promised return to investors, said information being a material fact, or

> d. Intentionally failing to disclose that on or about September 21, 2010, the Deputy Commissioner of the Texas State Securities Board issued Emergency Cease and Desist Order Number ENF-10-CDO-1693 against [appellant], ordering [appellant] to cease and desist from offering for sale any unregistered security in Texas, cease and desist from acting as an unregistered securities dealer or agent in Texas, cease and desist from engaging in material misrepresentations in connection with the offer for sale of securities in Texas, and cease and desist from engaging in any fraud in connection with the offer for sale of any security in Texas, said information being material facts.

As explained more fully below, the record contains evidence sufficient to support each of the four charged manners and means of intentional failure to disclose material facts.

*First Manner and Means*

On the first manner and means—"intentionally failing to disclose that previous investors' funds invested in the Warr Investment Program and the Warr International Program were used to pay the personal expenses of [appellant], said information being a material fact," appellant appears to argue that there is

20

insufficient evidence that his use of investment funds to pay his personal expenses is a material fact under the Texas Securities Act. *See* Tex. Rev. Civ. Stat. Ann. art. 581-4(F).

An omitted fact is material if there is a substantial likelihood that it would have assumed actual significance in the deliberations of a reasonable investor, in that it would have been viewed by the reasonable investor as significantly altering the total mix of available information used in deciding whether to invest. *See Bridwell v. State*, 804 S.W.2d 900, 904 (Tex. Crim. App. 1991). Sabban and Milligan testified appellant spent investor money on personal expenses, including a Mercedes Benz automobile, food and entertainment, and bank fees. Evidence also shows appellant transferred funds or wrote checks to his personal account in the amount of $40,000. Using funds from bank accounts appellant controlled, appellant spent $36,000 on travel, restaurants, retail purchases, and health care. Evidence shows appellant made these personal expenditures with investor funds, without authorization and without informing the investors.

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found that appellant's failure to disclose these expenditures would have altered the "total mix" of information known to a reasonable investor, affecting the decision of whether to invest. *See Bridwell*, 804 S.W.2d at 904 ("[A] jury could rationally conclude there was a substantial likelihood that a reasonable investor would want to know about . . . prior use of investors' funds for personal purposes")(internal quotations omitted). Legally sufficient evidence supports a finding that appellant's spending of investment funds on personal expenses would be a material fact. Thus, sufficient evidence supports the conviction based on the first manner and means of securities fraud. *See id*.

*Second Manner and Means*

On the second manner and means—"intentionally failing to disclose that previous investors' funds invested in the Warr Investment Program and the Warr International Program were not used to purchase real-estate notes or loans, said information being a material fact" — appellant argues that the evidence is insufficient because the State's evidence showed that approximately half of the funds invested, in fact, were used to purchase real-estate notes or loans. But all that the statute requires is that appellant intentionally failed to disclose a material fact. For instance, evidence shows that appellant failed to disclose that earlier-in-time investors' funds were not used to purchase real-estate notes or loans. The State did not dispute at trial, and does not dispute on appeal, that appellant used some of the investors' funds in the manner he promised. But, that does not change the fact that appellant did not disclose that he was not using some of the investors' funds as he promised. The Affiliate Agreements for both versions of WIG read:

> "[L]ending deposits . . . in combination of *all other funds* past and present, will be used to purchase real estate notes."[2]

Appellant's promotional materials and sales pitches also say that the business plan involved pooling all principal to purchase real-estate notes or loans. Appellant held out that he would draw his operating costs and profits from the $50 buy-in fee and from any interest beyond the guaranteed eight-percent return. Various investors testified that appellant promised he would pool all investor funds (other than the $50 buy-in fee) to purchase real-estate notes or loans and that they would have wanted to know if their principal was being spent in any other way. We conclude the record contains sufficient evidence to support a verdict based upon the second manner and means of securities fraud.

---

[2] (emphasis added).

*Third Manner and Means*

On the third manner and means — intentionally failing to disclose that the real-estate notes or loans were not generating sufficient revenue to meet the promised return to investors — appellant makes essentially the same argument made as to sufficiency of the theft count. Appellant appears to assert that because WIG was in business for less than a year, appellant had not yet had the opportunity to complete performance on his contracts and therefore might have been able to perform on the contracts. As discussed above, the receiver testified that the profit margin was too small to cover the necessary expenses and to pay investors the guaranteed eight-percent return, and it was impossible to pay "an eight percent return on the totality of the investors' funds when only fifty percent were [actually] invested" as represented.

The record evidence shows appellant actively misled the investors about WIG's performance history, using a line graph included in his promotional materials purporting to show the company's performance between 2000 and 2010, when the company did not even exist before the spring of 2010. The investors testified appellant did not tell them that the earlier investments were underperforming or had underperformed and that it would be impossible to meet the eight-percent return, and they would have wanted to know this information before investing. Viewing the evidence in the light most favorable to the jury's verdict, we conclude the record contains legally sufficient evidence to show appellant intentionally failed to disclose the material fact that the prior investments were not performing as promised.

*Fourth Manner and Means*

As to the fourth manner and means — intentionally failing to disclose the existence of the cease-and-desist order, appellant argues that the evidence is insufficient to establish *mens rea* because he testified he "believed that he was not

in violation of the order and also believed that he was not selling or offering for sale securities." Before the issuance of the emergency cease-and-desist order on September 21, 2010, several investors signed Affiliate Agreements and invested money with appellant. After the cease-and-desist order, several other investors signed Affiliate Agreements and transferred funds to appellant. Three of the investors who signed Affiliate Agreements after the cease-and-desist order testified that appellant never disclosed the existence of the cease-and-desist order. Appellant obtained $127,757.87 from those three investors after the cease-and-desist order issued. Rani Sabban testified that he personally served the cease-and-desist order on appellant at appellant's office. The order remained in effect from September 21, 2010, through January 6, 2011, when the receivership began.

During the cease-and-desist period, appellant changed the business name from Warr Investment Group to Warr International Group. In keeping with the name change, appellant made minor adjustments on the form documents, and continued to solicit investors through various means. The core product remained the same. "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." Tex. Pen. Code Ann. § 6.03(a). As a culpable mental state, intent generally must be inferred from the surrounding circumstances. *Nisbett v. State*, 552 S.W.3d 244, 267 (Tex. Crim. App. 2018). A jury "cannot read an accused's mind, and absent a confession, [a jury may] infer [an accused's] mental state from his 'acts, words and conduct.'" *Id.* (quoting *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991), *overruled on other grounds by, Fuller v. State,* 829 S.W.2d 191, 200 (Tex. Crim. App. 1992)). Although appellant testified that he subjectively believed he was not in violation of the cease-and-desist order, the jury was free to disregard this testimony. *See Chambers*, 805 S.W.2d at 461.

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found each of the four manner and means of the securities fraud count. We overrule appellant's third issue.

**B.** **Did the trial court reversibly err in denying appellant's requested mistake-of-fact instruction as to the securities-fraud offense?**

In his fourth issue, appellant argues the trial court reversibly erred in refusing to submit the mistake-of-fact instruction he requested as to the securities-fraud count. Appellant claims the alleged mistakes negate the requisite criminal intent. Appellant identifies two alleged mistakes, neither of which negate the criminal intent as to all four manners and means of the securities-fraud count. A jury instruction on mistake of fact may be given only if it negates the culpable mental state required for all the manners and means alleged. *See Murchison*, 93 S.W.3d at 252. Even if the trial court erred in refusing to instruct the jury on mistake of fact, that error does not rise to the level of reversible error because the jury received the requested instruction on both the misapplication-of-fiduciary-property charge and the theft charge and rejected mistake of fact on both.

When reviewing allegations of jury-charge error, we first must determine whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If we find error, then we must determine whether the error caused sufficient harm to warrant reversal. *Id.* The degree of harm required for reversal depends on whether the error was preserved. *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986). Where a defendant has preserved error, we must reverse unless we determine the error is harmless. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). To determine whether charge error is harmless, we assess the actual degree in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of

25

the trial as a whole. *Id.* If we determine that the trial court erred, then we analyze whether sufficient harm resulted from the error to require reversal. *See Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994).

Appellant claims his trial testimony raised defensive issues as to whether he reasonably yet mistakenly believed the business was generating sufficient income to pay expenses and whether he reasonably yet mistakenly believed he had sufficiently addressed the State Securities Board's concerns as laid out in the cease-and-desist order. Appellant argues the trial court erred in denying his proposed mistake-of-fact instruction as to the securities-fraud offense and that he suffered harm from the trial court's refusal to submit the requested instruction. We find no merit in these arguments.

In determining whether the trial court's refusal to issue a statutory defensive instruction amounts to reversible error, we first must decide if the trial court erred. *See Abdnor*, 871 S.W.2d at 731–32. Under the defense of mistake of fact, "[i]t is a defense to prosecution that the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense." *See* Tex. Pen. Code Ann. §8.02. The defendant is entitled to an instruction on "any defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or contradicted, and regardless of how the trial court views the credibility of the defense." *Celis v. State*, 416 S.W.3d 419, 430 (Tex. Crim. App. 2013). To raise an issue of mistake of fact, the evidence, viewed in a light favorable to appellant, must have raised an issue as to the existence of a mistaken belief by appellant that negates the culpable mental state of the offense. *Celis*, 416 S.W.3d at 430, 432 (holding that defendant not entitled to mistake-of-fact instruction when charged with having culpable mental state of "intent to obtain an economic benefit" where evidence of alleged mistaken

26

belief went to whether defendant believed he was licensed and in good standing to practice law and citing *Murchison v. State*, 93 S.W.3d 239 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd), and *Gant v. State*, 814 S.W.2d 444 (Tex. App.—Austin 1991, no pet.) with approval)). When, as in this case, a defendant requests a mistake-of-fact instruction in a jury charge containing multiple manners and means, to raise an issue of mistake of fact, the evidence, viewed in a light favorable to appellant, must have raised an issue as to the existence of a mistaken belief by appellant that negates the culpable mental state as to each of the manners and means. *Murchison*, 93 S.W.3d at 252 (holding, in a securities-fraud failure-to-disclose-material-facts case, defendant not entitled to mistake-of-fact instruction when charged with five manners and means but alleged mistakes did not negate *mens rea* for all five manners and means); *see also Gant v. State*, 814 S.W.2d 444, 452–53 (Tex. App.—Austin 1991, no pet.) (concluding there was no reversible error in declining to give mistake-of-fact instruction in a securities-fraud failure-to-disclose case with multiple manners and means where alleged mistaken belief did not align with *all* of the manners and means). The evidence does not do so.

Appellant sought a mistake-of-fact instruction that applied to only two of the four alleged manners and means charged in Count III of the indictment. Appellant's two allegedly mistaken beliefs — that his ongoing operations did not violate of the cease-and-desist order and that the business was generating sufficient income to pay expenses — do not negate the intentional failure to disclose that client funds were spent on personal expenses or that the funds were not used entirely to purchase real-estate notes or loans. At most, appellant's mistake-of-fact instruction negated intent as to only two of the four manners and means. So, the trial court did not err in refusing to submit this instruction as to the securities-fraud count. *See Murchison*, 93 S.W.3d at 252; *Gant*, 814 S.W.2d at 452–53.

27

Yet, even if the trial court's refusal to give a mistake-of-fact instruction on the securities-fraud count constituted error, the error would be harmless and so provide no basis for appellate relief. Appellant requested a mistake-of-fact instruction on three counts — misapplication of fiduciary property, theft, and securities fraud. The trial court specifically ruled that the requested mistake-of-fact instruction failed to negate the culpable mental state as to securities fraud. But, the trial court submitted the mistake-of-fact instruction as to the other two charged offenses.

Appellant argues that his main defensive theories were that his chief operating officer led him astray as to the performance of the business, and that appellant allayed the Securities Board's concerns. Appellant says the absence of the mistake-of-fact instruction on the securities-fraud count deprived the jury of the proper law and compromised his right to a unanimous verdict on securities fraud. Appellant failed to preserve error regarding unanimity. During closing arguments, appellant argued the defensive theory of mistake of fact without limiting it to theft and misapplication of fiduciary property. Appellant argued he had been "misled by [the chief operating officer] who [was] taking a lot of money out of the company" as to the overall performance of "WIG" and its investments. Appellant argued he believed "the properties were[ ] making the returns [he] claimed" and that he had met with the Securities Board representatives, explained his understanding of the Program, and believed, following the meeting, that he had addressed the Board's concerns.

The jury considered appellant's mistake-of-fact defense on the theft and misapplication-of-fiduciary-property offenses, and rejected that defense. The facts underlying all three counts are the same or substantially similar. Nothing in the record suggests the jury would have disbelieved appellant's mistake-of-fact

28

defense as to theft and misapplication of fiduciary property yet would have believed it as to the securities-fraud count and acquitted him of that charge. *See Walker v. State*, 300 S.W.3d 836, 848–49 (Tex. App.—Fort Worth 2009, pet. ref'd) (holding, where jury clearly disbelieved testimony raising mistake-of-fact defense that defendant mistakenly believed victim was not a peace officer, based on verdict on other issues, refusal to include request mistake-of-fact language in application paragraph of a self-defense instruction was harmless); *Gerber v. State*, 845 S.W.2d 460, 462, 466–67 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd) (concluding that, where defendant was charged with murder, manslaughter, aggravated assault, and criminally reckless homicide, and where jury received mistake-of-fact instructions as to murder and returned a "guilty" verdict on murder despite mistake-of-fact instructions, no harm in failing to instruct jury on mistake of fact as to lesser-included offenses). So, even if the trial court had erred in refusing the instruction as to the securities-fraud count, appellant suffered no harm from this error. *See Gerber*, 845 S.W.2d at 462, 466–67.

Concluding that there was no error or harm, we overrule appellant's fourth issue.

### C. Has appellant shown error as to the money-laundering offense?

Under his fifth issue, appellant asserts that this court must reverse the judgment as to the money-laundering count if this court sustains the first three issues or the fourth issue. Because we have overruled the first four issues, appellant's challenge in the fifth issue lacks merit. Thus, we overrule the fifth issue.

Having overruled all of appellant's issues, we affirm the trial court's four judgments.


/s/     Kem Thompson Frost
        Chief Justice


Panel consists of Chief Justice Frost and Justices Jewell and Bourliot.

Do Not Publish—Tex. R. App. P. 47.2(b).