

# NUMBERS 13-18-00454-CR AND 13-18-00456-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

EVERETT CRAIG WILLIAMS,                                    Appellant,

v.

THE STATE OF TEXAS,                                        Appellee.

**On appeal from the 94th District Court
of Nueces County, Texas.**

# MEMORANDUM OPINION

**Before Justices Benavides, Perkes, and Tijerina
Memorandum Opinion by Justice Perkes**

Appellant Everett Craig Williams appeals his convictions from two causes.[1] Following a jury trial,[2] Williams was convicted of securities fraud under the Texas Securities Act, a first-degree felony (appellate cause number 13-18-00456-CR), *see* TEX. REV. CIV. STAT. ANN. art. 581-29(C)(4)(c), and aggregate theft of property valued at over $100,000 but less than $200,000, a second-degree felony[3] (appellate cause number 13-18-00454-CR). *See* TEX. PENAL CODE ANN. §§ 31.03(a), (e)(6), 31.09(a). The trial court sentenced Williams to twenty years' confinement in the Texas Department of Criminal Justice, Institutional Division under the Texas Securities Act and fifteen years' confinement for aggravated theft. Williams argues the evidence was insufficient to support either jury verdict. We affirm.

## I. BACKGROUND

### A. The Indictments

On December 16, 2016, the State indicted Williams under the Texas Securities Act.[4] *See* TEX. REV. CIV. STAT. ANN. art. 581-29. The State alleged Williams, acting on behalf of Favor Ministries, Incorporated,[5] sold securities for interest in real estate

---

[1] Because the matters in both appeals are related, we issue this single memorandum opinion addressing both appellate causes in the interest of judicial efficiency.

[2] The causes were not consolidated at the trial level, but the parties agreed to try the cases contemporaneously.

[3] The legislature has since amended the statute to increase the value of the property stolen for purposes of assessing punishment, but the amendment does not apply to this case. *See* Act of May 19, 2011, 82nd Leg., R.S., ch. 323, § 1, sec. 3(c)(5), 2011 Tex. Gen. Laws 941, 942 (amended 2017) (current version at TEX. PENAL CODE ANN. § 31.03(e)(6)) (providing that the amendments apply only to an action filed on or after September 1, 2017). We will cite the prior version where it materially differs from the current version.

[4] The State amended its indictment on April 13, 2017, to include complaining witness, Robert Pierce.

[5] Favor Ministries is a Nevada-based, non-profit corporation principally run by Williams.

properties through "investment contracts, promissory notes, and evidences of indebtedness to each of the persons listed below," in the following amounts:

| DATE | NAME | AMOUNT |
|------|------|--------|
| 05/12/2011 | John McNeill | $50,000 |
| 07/24/2011 | Errol White | $25,000 |
| 09/04/2011 | Errol White | $20,000 |
| 09/07/2011 | Errol White | $5,000 |
| 12/20/2011 | Janet Kearney | $70,000 |
| 04/18/2012 | Robert Pierce | $20,000 |
| 04/21/2012 | Robert Pierce | $5,000 |

The State alleged all said amounts were fraudulently "obtained pursuant to one scheme and continuing course of conduct, and the aggregate amount obtained was $100,000 or more." The State additionally alleged that fraud had been committed "in connection with the sales and offer for sale of said securities" by intentionally failing to disclose the following material judgments and financial conditions:

. . . on or about July 26, 2004, the defendant was the subject of a judgment . . . in Harris County, Texas, in the amount of $10,134.60, . . .

. . . on or about August 30, 2004, the defendant was the subject of a default judgment . . . in Nueces County, Texas, in the amount of $1,725,000.00 plus $3[,]500 for attorney's fees, . . .

. . . on or about March 7, 2005, the defendant was the subject of a final judgment . . . in Nueces County, Texas, in the amount of $362,296.10 plus $115,050 for attorney fees, . . .

. . . on or about January 25, 2006, the defendant was the subject of a judgment . . . in Nueces County, Texas, in the amount of $6,923.66 plus $4,467.69 for attorney's fees, . . .

. . . on or about July 17, 2006, the defendant was the subject of a judgment . . . in the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division, in the amount of $352,277.57, . . .

. . . on or about August 28, 2007, a Notice of Federal Tax Lien was filed by the Internal Revenue Service in the records of the Nueces County Clerk's office against [Williams] in the amount of $216,744.20 for tax periods ending 12/31/2002, 12/31/2005, 12/31/2006, . . .

. . . on or about January 31, 2008, the defendant was the subject of a final judgment . . . in Nueces County, Texas, in the amount of $176,500 plus $15,000 for attorney's fees, . . .

. . . on or about July 25, 2008, the defendant was a subject of a judgment in . . . in Bexar County, Texas, in the amount of $55,302.40, . . .

. . . on or about February 27, 2009, the defendant was the subject of a judgment . . . in United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division, in the amount of $284,571.01 as actual damages, plus $1,500,000.00 as exemplary damages, plus $719,193.86 attorney's fees, . . .

. . . on or about June 30, 2009, a Notice of Child Support Lien was filed [against Williams] . . . in the amount of $15,033.20 as a result of a child support order entered on 3/25/2008, . . .

. . . on or about September 9, 2010, a forcible entry and detainer judgment [was entered against Today's Solutions, a company owned by Williams] . . . in Williamson County, Texas, in the amount of $7,005, . . .

. . . that investor funds used to pay personal expenses of the defendant, said information being of material fact; and intentionally failing to disclose that prior investment programs sold by the defendant . . . had not performed as promised and that clients who were sold interest in such programs had experienced significant losses of their investment, . . .

. . . investor funds would be used for purposes other than those intended, . . .

. . . the true financial condition of Favor Ministries and other companies that defendant was affiliated with and the personal financial condition of [Williams], . . .

On April 13, 2016, Williams was also separately indicted on one count of aggregated theft for unlawfully appropriating more than $100,000 but less than $200,000. *See* Act of May 19, 2011, 82nd Leg., R.S., ch. 323, § 1, sec. 3(c)(5), 2011 Tex. Gen. Laws 941, 942 (amended 2017) (current version at TEX. PENAL CODE ANN. § 31.03(a), (e)(6)). Appropriation by deception was alleged, and the indictment contained the same

4

complaining witnesses and appropriated amounts as listed in the securities fraud indictment.

**B.     The Trial**

At trial, the State argued that Williams, through Favor Ministries and "The Favor Investment Program," sold investments promising two-fold returns, intended to use investor funds for personal expenditures, and failed to disclose to investors that he collectively owed millions in civil court judgments and other material financial information. In support, the State admitted several thousand pages of exhibits into evidence and called seven witnesses: the individual responsible for gathering investors for a commercial real estate venture in Channelview, Texas; four complaining witnesses; and two Texas State Securities Board employees.

**1.     Kenneth McNeill**

Kenneth McNeill (Kenneth), a UPS driver, testified he used to run his own company, working with homeowners facing foreclosures and "providing, most of the time, short sales to liquidate their house." It was then, around 2007 or 2008, that he was first introduced to Williams. Upon learning of Kenneth's entrepreneurial aspirations, Williams "offered to mentor [him] in commercial real estate."

After a first property venture arranged by Williams "fell through,"[6] Kenneth said Williams told him to "find some distressed apartment complexes so [they] c[ould] purchase them and redo them." Kenneth found a promising commercial real estate listing in Channelview, Texas, and Williams took lead, operating thereafter under Favor

---

[6] Kenneth said he was told by Williams that the owner of the property had been diagnosed with cancer, and ". . . we stopped doing it when he got cancer."

5

Ministries.[7] The Channelview property owners wanted $2.1 million with "$50,000 down" for the sale of the property, and Kenneth claimed Williams tasked him with finding investors to cover the $50,000 down payment.[8]

Kenneth testified he approached his 80-year-old father, John, and a man he knew from church, White, in the spring of 2011 with the opportunity to invest and "[d]ouble" their investment. According to Kenneth, John and White executed separate investment contracts with Favor Ministries in the summer of 2011, before wiring and sending personal checks payable to Favor Ministries but addressed to Williams's personal residence.

In October 2011, Kenneth began emailing Williams, inquiring about the status of the Channelview investment. Following a series of emails,[9] Kenneth testified he, John, and White received two emails from Williams on January 11, 2012. In the first email, Williams "apologize[d] for [his] delay," assuring the three men that the deal would "close by the end of [January 2012]," and if it did not, he would "return the investment within 90 days with a minimum of 25% and as much as a 100%." Williams also asked them not to

---

[7] Kenneth testified he was never employed by Favor Ministries in any capacity.

[8] At trial, the State admitted several emails exchanged between Kenneth and Williams. In an email dated May 4, 2011, Williams asked Kenneth to "come up with $60,000 [sic] partners on the 74 unit deal." The email concluded: "If not, how much can you guys come up with? It will be well worth it."

[9] On November 22, 2011, Kenneth sent an email to Williams accusing him of "ignoring" text messages, phone calls, and emails. "I have my Father and [White] wanting to know what is going on with their money and have NO answers for them. I am not happy with the position you have put me in. Your actions are not of a Christian." Williams responded the same day, stating in full: "Quit stressing. Everything is fine."

Kenneth pressed again on November 28, 2011, demanding "answers" and complaining, in part: "I am in the middle of $100,000 that Favor Ministries has for several deals . . . $50K was for [the] [Channelview] deal and that is not happening and the money should be returned immediately to the investors . . . . " Williams responded several hours later, stating in full: "Your badgering tactics are offensive and very disrespectful. My obligation is to perform. I will not respond until you shut up and back off. I have already answered you and nothing has changed. I do not work for you and I am[] not one of your children. You cannot make me do anything."

contact the Channelview property seller so as not to "confuse" the seller "with multiple conversations."

Several hours later, Williams sent an email proposing an "alternative to [their] original agreement." Williams reiterated that the Channelview property "should close around" January 31, 2012. "If so, $100,000 [(]100 percent of the original $50,000) will be repaid within 180 days of closing ($400 [sic] monthly beyond March until $100,000 is paid in full.[)]" In the event the property "does not close," Williams guaranteed "$72,000 (44% return on $50,000 investment) will be paid by April 30th, 2012."

To Kenneth's knowledge, neither his father nor White ever received their promised compensation from Williams or recouped their initial investments. Kenneth also testified he was unaware that Williams had outstanding judgments in excess of two million dollars or that Williams had used investor funds for purposes other than those which were promised.

### 2. John McNeill

John testified that, upon learning of the investment opportunity through his son, he took out a home equity loan and sent a $50,000 wire transfer to an account held by Favor Ministries on May 12, 2011. The funds were sent for the sole purpose of investing in the Channelview property.[10] John further testified that though he did not speak to Williams in person, the two men communicated extensively through emails. In a June 12, 2012 email

---

[10] John received a letter dated May 12, 2011, issued on a Favor Ministries letterhead, and signed by Williams, which read in relevant part:

> . . . You have agreed to invest the sum of Fifty Thousand ($50,000) Dollars which [sic] amount shall be applied towards the acquisition of the [the Channelview property].

> You have agreed to remit your investment funds by end of day, May 12, 2011, . . . to me by bank wire. In the event the closing of the acquisition of the [the Channelview property] is not consummated by May 31, 2011, we shall return to you in full your funds.

admitted at trial, John outlined the progression of previous conversations with Williams, while expressing his concern that he would never "see [his] money again."

> On 7/12/11, you said that the additional $25k would be paid back 1/12/12 in the amount of $32K. [O]n 1/11/12 (10:43am), you said that $50K plus 25-100% would be paid on 4/30/12. [O]n 1/11/12 (4:24pm), you said that $72K would be paid on 4/30/12. I lost the next e-mail somewhere in cyberspace but my recollection is that $72K would be forthcoming on 6/1/12. . . . What is going on? The money was for [Channelview]; that fell through and I have no idea where my money is[.]

The $50,000 that John wired to Favor Ministries to be invested in the Channelview property was never returned to him. Like Kenneth, John testified he was unaware that Williams had any outstanding judgments or liens, that prior investments managed by Williams had "not performed as promised," or that the funds he provided were used to pay for Williams's personal expenses. When asked whether it would have affected his decision to invest if he had known about the aforementioned, John responded, "Yes, I would not have done it."

### 3.    Errol Wayne White

White testified he was approached by Kenneth, a member of his church congregation, about a commercial real estate opportunity requiring a $25,000 investment. On July 24, 2011, White wrote a personal check addressed to Williams. White thereafter received a letter dated July 28, 2011, signed by Williams, and written on a Favor Ministries letterhead, which stated in part:

> This will confirm that it is our intention to acquire all of the outstanding member interests in and to [the Channelview Property]. You have agreed to invest the sum of Twenty[-]Five Thousand ($25,000) Dollars which [sic] amount shall be applied towards the acquisition of the [Channelview Property].
>
> . . . In the event the closing of the acquisition of the [Channelview Property] is not consummated by 1 September 2011 or agreed upon extension by

8

Favor Ministries and [the Channelview Property], we shall return to you in full your funds.

White was contacted several months later by Kenneth and Williams about a second investment opportunity. Because White had not expected to be "made whole" or see a profit until "after the purchase was actually made," White said he saw no reason for concern. On September 4, 2011, White executed a check payable to Favor Ministries for the sum of $20,000. He issued Favor Ministries a subsequent check for $5,000 eight days later.

Just as Kenneth and John testified, White did not recover any of the money he invested and said he was unaware of Williams's prior outstanding judgments and financial obligations, that prior investments had "not performed as promised," or that Williams had spent his investment on personal expenses.

### 4.      Janet Marie Kearney

Kearney testified that she reached out to Williams, her long-time friend, in 2011 to inquire about a real estate seminar she had been invited to. "He told me[,] [']Jan, don't invest your money in that.['] And then he went on to tell me that he had something that I could invest my money in." Kearney said the two met in person, and Williams presented her with "some kind of architectural pictures or blueprint on a project that he was working on." Williams also gave Kearney an investment agreement, which was admitted at trial and read, in part: "Kearney shall invest with Favor Ministries the sum of $70,000 to be invested by Favor Ministries in such program or investments as Favor Ministries in its sole discretion shall determine." According to Kearney, Williams assured her that her investments would grow more than two-fold: "I would be investing $70,000 in the

9

beginning, and . . . the final sum would be 400,000 every six months for the total of 18 months."

Kearney testified that she had reservations about investing and initially refused to sign Williams's proposed contract. After she declined, Williams sent her two emails. One was a forwarded email, informing her that Williams had a seller interested in selling a property requiring investors. The other email stated, in part:

> . . . You have seen me winning for years. You have experienced your own personal success with my efforts, yet you still doubt me. Why do I have to convince you again? Am I not responsible for the most valuable asset you have?[11] Again, don't answer that. I get it.
>
> I asked you on 3 separate occasions if you were sure and you said yes. I told you that I had a lot riding on your word. I just received an email this evening that my apartment complex was ready. The seller got his insurance check. I am now short of the cash to do the deals that will make me about $3,000,000. Your decision threatens my ability to capitalize on this opportunity.
>
> . . .
>
> You wanted an opportunity and GOD provided it so don't blame him for your situation later. I believe that you are overlooking your tommorrow [sic] but, it's your tommorrow [sic], not mine. I have been hurt by a lot of people and unfortunately, all of them have been my own people. "I am done with helping us[.]"
>
> Again, I am sorry for anything that I have done or said to put you in an uncomfortable position. My intent was only to help you. . . .

Thereafter, Kearney said she was the recipient of "continued" phone calls from Williams. On December 20, 2011, Kearney stated she "caved in," pulled money out of her retirement account, and wired $70,000 to Favor Ministries for the purpose of investing in

---

[11] Kearney testified that Williams was referencing to a time when he assisted her in purchasing her home in 1987.

10

an unspecified real estate opportunity. According to Kearney, Williams's assured her that she would receive her financial return by May 2012.

Like the other complaining witnesses, Kearney never recovered her investment, and she was unaware of Williams's outstanding civil judgments, history of misusing investment funds, and intended use of her invested funds for personal expenses. Had she known, Kearney stated she "wouldn't have invested."

### 5.    Robert Pierce

Pierce testified that he was contacted by Williams in early 2012 concerning a real estate opportunity for a "tea farm" in Hawaii requiring a $20,000 investment. "He approached me as a business—as a business deal. As a friend I told him, 'I'll just give you a loan, you can pay me back the exact amount you gave me.' He insisted it be a business deal where I make a profit," said Pierce, who added that the two solidified the deal in writing.[12] According to Pierce, the contract stipulated how much money he would make "back in stages as installment payments based off of the investment." Pierce made two checks payable to Favor Ministries: on April 18, 2012, he signed a check for $20,000, and on April 21, 2012, he signed a second check for $5,000. Soon after, Pierce "stopped hearing from" Williams, "tried to contact [Williams] once and couldn't get through," and ultimately never recuperated his $25,000 investment.

Pierce testified that he knew Williams had "financial problems" and recalled being told by Williams that he "owed money in taxes," but maintained that such information was not alarming because "a lot of people owe IRS for taxes." Pierce stated, however, he was

---

[12] Pierce stated that he had since "destroyed the document," explaining that he did not want to "hold on to things that make [him] remember how stupid [he was]."

unaware of any of Williams's outstanding civil judgments and liens or that Williams sought to use his investment funds for personal expenses.

### 6.     Eliza Lujan

Eliza Lujan, a financial examiner with the Texas State Securities Board, testified that she reviewed "bank records from nine different banks," "mortgage and closing documents from five different title companies, credit card statements[,] and utility records." According to Lujan, monies from all four investors were deposited or wired directly into one Favor Ministries account, wherein Williams and his wife, Claudia, were the only authorized signers. In the immediate period following disbursement of investor funds into the account, Lujan noted that the account was nearly depleted, and all recorded expenditures were largely personal. Lujan confirmed not a single account reviewed yielded a payment made in reference to the Channelview or Hawaiian property investments.

### a.     John's Investment

Based on documents she reviewed, Lujan testified that on May 12, 2011, the Favor Ministries bank account had a balance of $50. The only deposit made in a fifteen-day period between May 12th through May 27th, was a $50,000 wire transfer from John. Meanwhile, Lujan noted expenditures from the account included: a $24,334.15 check to Waypoint Title of Austin for a "settlement cost"; cash withdrawals totaling $11,500; $2,000 to an account titled "Everett Williams at Velocity"; $1,611 to an automobile policy for two vehicles registered to Williams; $1,000 payment to a person unknown to this case; $943.47 check payable to Nueces Electric; $700 transfer to an account titled to Claudia; and 700 store transactions from the San Marcos Outlet Mall. No transactions were made

regarding the Channelview property. By May 27, 2011, the bank account balance was $4,136.30.

### b. White's Investment

Lujan testified that personal expenditures continued to be made out of the account for the time period between July 25, 2011, and August 4, 2011. On July 25th, the account balance was $9,493.54. Shortly thereafter, Williams deposited White's $25,000 check. For the eleven-day period that followed, there were only two other sources of funds, amounting to less than $500. Expenditures for the eleven-day period totaled $33,502.36,[13] and the ending balance on the account was $1,472.67. No transactions were made regarding the Channelview property.

Lujan also examined the time period between September 6, 2011, and October 31, 2011. Lujan confirmed White's second and third payments came in on September 6th and September 13th, respectively, totaling $25,000. "Total source of funds" for this period, including White's payments, equaled $45,669.65. However, by the end of the examined period, the Favor Ministries account balance reflected $135.22. Again, no transactions were made regarding the Channelview property.[14]

---

[13] Tracked expenditures from the account included: two cashier's checks totaling $5,315.21, with a memo line indicating that the expenses were for furniture and a private residence; a $5,000 check payable to a law office; $3,825.48 to various retail stores; $3,438.62 to the mortgage company of Williams's personal residence and for payment of his residence's utilities; and numerous travel, automobile maintenance, restaurant, grocery, and miscellaneous expenses.

[14] Expenditure sources included: $13,500.00 to five individuals unknown to the case; $4,599.95 to Favor Ministries for a "Settlement Cost"; $5,000 for furniture; $3,079.56 to "All South Insurance"; $2,696.16 for "Dress Shop, Sam's, Walmart, Home Depot, etc"; $1,868.5 in cash withdrawals; $2,000 to Kenneth; $2,000 to "Sherriff's Memorial Benevolent–Fire Relief"; $1,940.93 for "Automobile expenses"; and numerous travel, restaurant, grocery, and miscellaneous expenses.

### c. Kearney's Investment

Lujan noted that between December 21, 2011, through February 16, 2012, the initial account balance was $33.58. On December 21st, the account received a wire transfer from Kearney for $70,000. Additional sources of funds for that time period were: $2,000 for a "2001 Chevy Venture"; $600 from Claudia's checking account; and $175 from "Ultimate Trucking, LCC" for "Feb. Rent". By the end of the reviewed period, the account had a balance of $534.63. Lujan testified that none of the expenses in the time period could be traced to one of the named business investments.[15]

### d. Pierce's Investment

Lastly, Lujan testified regarding her reports of the account for April 18, 2012, through May 7, 2012. On April 18, the account balance was $34.27. Pierce's two checks, totaling $25,000, were the sole source of funds for the examined period. By May 7, Williams had spent $24,882.16, and his account balance was $152.11. Lujan, again, stated all transactions appeared personal.

## 7. Joseph Oman

Joseph Oman, assistant director of enforcement at the Texas State Securities Board and the State's qualified Texas Securities Act expert, testified to the parameters of the Act and opined as to whether, having reviewed the investment products in this case, the Act was implicated.

---

[15] For example, Lujan said $15,107.87 went to Williams's private residence for multiple mortgage payments, utilities, and home owner association fees; $10,399.29 went to furniture, clothing, beauty, and home improvement stores; $8,084.00 was withdrawn as cash; $3,500.00 to a law office; $3,053.16 to automobile expenses; $2,513.83 for medical and dental expenses; $1,664.01 in veterinarian costs; and $1,617.12 for hotel and airline travel.

Oman stated the signed documents that White, John, and Kearney executed constituted a written "security in form of either an investment contract or evidence of indebtedness." Because there were no documents for Oman to review concerning Pierce, Oman based his assessment off Pierce's statements: "It sounded that he had the terms of payment, which kind of mirrors [Kearney's agreement], so it could be construed as an investment contract too."

According to Oman, the only responsibility imposed on an investor is to act "reasonabl[y]." With respect to (1) Williams's numerous outstanding civil judgments, totaling over $2 million, (2) Williams's history of failed investments, which had "not performed as promised," and (3) Williams's use of investor funds for personal expenses, Oman affirmed such information would be "a material fact to a reasonable investor."

A jury returned a guilty verdict on both causes. This appeal follows.

## II.     SUFFICIENCY OF THE EVIDENCE

Williams challenges the sufficiency of the evidence relating to the five-year statute of limitations, applicable to both charges at issue. *See* TEX. CODE CRIM. PROC. ANN. art. 12.01(4)(A) (setting out that the statute of limitations for felony theft is "five years from the date of the commission of the offense"); TEX. REV. CIV. STAT. ANN. art. 581-29-1 (providing that charges for securities fraud must be brought "before the fifth anniversary of the day on which the offense is committed"). Specifically, Williams argues that the State did not produce sufficient evidence to support a finding that the theft or securities fraud incidents occurred in aggregation, "pursuant to one scheme or continuing course of conduct." TEX. PENAL CODE ANN. § 31.09; TEX. REV. CIV. STAT. ANN. art. 581-29-2. And absent evidence of aggregation, because the statute of limitations run from the date of the last element of

15

the last aggregated offense, which Williams asserts was also unsupported by the evidence,[16] he was thereby charged outside of the five-year limitation period.

## A.    Standards of Review and Applicable Law

When evaluating a sufficiency challenge, we consider the evidence in the light most favorable to the verdict to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Chambers v. State*, 580 S.W.3d 149, 156 (Tex. Crim. App. 2019); *see Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In our analysis, we give deference to "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); see TEX. CODE CRIM. PROC. ANN. art. 38.04. When the record contains conflicting inferences, we presume that the trier of fact resolved any such conflicts in favor of the prosecution, and we must defer to that resolution. *Padilla v. State*, 326 S.W.3d 195, 200 (Tex. Crim. App. 2010). Additionally, we treat circumstantial evidence as being equally probative as direct evidence. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

---

[16] In his brief, Williams approaches each individual allegation of appropriation between himself and an investor as a separate and distinct offense that the State should have been required to prove. Namely, Williams argues there was no evidence of theft by deception with respect to Pierce, because Pierce "knew [that he] had tax indebtedness and other financial problems," and Pierce was "determined to loan [him] money despite [Williams's] financial condition." However, under the aggregate theft and securities fraud statutes, "the continuing course of conduct creates one event encompassing all the [incidents] alleged in the time period in the indictment." *Martinez v. State*, 527 S.W.3d 310, 323 (Tex. App.—Corpus Christi–Edinburg 2017, pet. ref'd). Therefore, we only address Williams's challenge to sufficiency of the evidence regarding the same scheme and continuing course of conduct for each cause, which is nonetheless dispositive.

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.*

## B.    Aggregate Theft

A person commits the offense of theft if that person "unlawfully appropriates property with the intent to deprive the owner of the property." *Id.* § 31.03(a). The penal code contains an aggregation provision, which provides that amounts obtained by theft "pursuant to one scheme or continuing course of conduct, whether from the same or several sources, may be considered as one offense." Tex. Penal Code Ann. § 31.09. When a defendant is charged with aggregate theft, however, "the state is not required to prove each individual appropriation." *Kent v. State*, 483 S.W.3d 557, 561 (Tex. Crim. App. 2016).

"Appropriation" is unlawful if "it is without the owner's effective consent." *Id.*; *see also id.* § 31.01 ("'Effective consent' includes consent by a person legally authorized to act for the owner."). "Deception" is defined, among other things, as:

> (A) creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true;
>
> (B) failing to correct a false impression of law or fact that is likely to affect the judgment of another in the transaction, that the actor previously created or confirmed by words or conduct, and that the actor does not now believe to be true;

17

. . .

> (E) promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed, except that failure to perform the promise in issue without other evidence of intent or knowledge is not sufficient proof that the actor did not intend to perform or knew the promise would not be performed.

*Id.* § 31.01(1)(A), (B), (E); *see Demond v. State*, 452 S.W.3d 435, 454 (Tex. App.—Austin 2014, pet. ref'd).

Here, aggregate theft was charged by deception.[17] *See* TEX. PENAL CODE ANN. § 31.01(1)(A), (B), (E); *see also Fernandez v. State*, 479 S.W.3d 835, 838 (Tex. Crim. App. 2016) (providing that evidence of "the deception must precede the consent given"). Therefore, it was the State's burden to prove that Williams unlawfully appropriated property, valued at more than $100,000 but less than $200,000, by inducing "consent of its transfer because of a deceptive act," namely under § 31.01(A), (B), or (E) of the penal code, and amounts obtained by theft were pursuant to one scheme or continuing course of conduct. *See* TEX. PENAL CODE ANN. §§ 31.01(1)(A), (B), (E), 31.03(a), (e)(6); *Braughton*, 569 S.W.3d at 608; *Fernandez*, 479 S.W.3d at 838.

---

[17] The jury charge, in applicable part, read as follows:

> . . . And said appropriations were without the effective consent of said owners in that consent was induced by deception, to wit: said defendant created or confirmed by words or conduct false impressions of fact that were likely to affect the judgment of said owners in the transactions and that the defendant did not believe to be true; or said defendant failed to correct false impressions of fact that were likely to affect the judgment of said owners in the transactions, that said defendant previously created or confirmed by words and conduct, and that said defendant did not at the time believe to be true; or said defendant promised performance that was likely to affect the judgment of others in the transactions and that the defendant did not intend to perform or knew would not be performed, except that failure to perform the promises in issue without other evidence of intent or knowledge is not sufficient proof that the defendant did not intend to perform or knew the promises would not be performed; . . .

18

Williams principally argues, however, that the evidence is legally insufficient to prove the thefts were all part of a same scheme or continuing course of conduct pursuant to the aggregated theft statute. Williams contends that any alleged deceptive appropriation concerning Pierce was too far removed from the appropriation of the remaining three complainants because it was "interrupted by 4 months intervening between his dealing with Ms. Kearney" and it concerned an unrelated property.

We are unpersuaded by Williams's blanket declarations and instead find evidence of same scheme and continuing course of conduct following an analysis of the means and methods employed by Williams in his commission of the offense. *See* TEX. PENAL CODE ANN. § 31.09; *see generally* TEX. GOV'T CODE ANN. § 311.011(a) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage."); *see also Lyon v. State*, No. 02-17-00195-CR, 2018 WL 6816209, at *7 (Tex. App.—Fort Worth Dec. 27, 2018, pet. ref'd) (mem. op., not designated for publication) (providing that the words "scheme" and "continuing course of conduct" are "terms of common understanding" (quoting *Sendejo v. State*, 676 S.W.2d 454, 456 (Tex. App.—Fort Worth 1984, no pet.))); *see, e.g.*, *Ex parte Nugent*, 593 S.W.3d 416, 426–27 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (finding evidence of same scheme and continuing course of conduct in real estate aggregate theft case where defendants filed fraudulent deeds to insert themselves into the chains of title for multiple properties and sold the properties to third parties).

The evidence shows that within a one-year period: (1) Williams solicited commercial real estate investment opportunities on behalf of Favor Ministries; (2) all four investors testified that they were guaranteed a two-fold minimum return on their financial

19

investment over a specified, tiered period of time; (3) according to Lujan, once Williams received monies from investors, said monies were spent on personal expenditures within sixty days, and no commercial properties were invested in with investor funds; and (4) each investor testified they never recouped their initial investments or received their promised returns. *See Ex parte Nugent*, 593 S.W.3d at 426–27; *Riley v. State*, 312 S.W.3d 673, 676 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (finding a "pattern or scheme established" where the defendant accepted money from four different persons for the purpose of constructing four unrelated buildings); *Johnson v. State*, 187 S.W.3d 591, 603 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) (continuing scheme found where defendant, using the same alias, requested and obtained large amounts of money from seven different attorneys over a ten-month period based on multiple falsified stories); *cf. Lyon*, 2018 WL 6816209, at *7 (providing that where one scheme was an inducement for an investment "based on the promise of a large financial return" and another scheme was for the sale of property to the defendant "based on a false promise to pay," the two schemes were without the same "means or method of appropriation," and therefore, could not be aggregated). Further, the jury could have also reasonably inferred from Williams's continued conduct that he never intended to used investor funds for their intended purpose at the time he appropriated the funds. *See Taylor v. State*, 450 S.W.3d 528, 536 (Tex. Crim. App. 2014); *Riley*, 312 S.W.3d at 676 ("The jury could find evidence of appellant's intent to commit theft through deception based on inferences from the surrounding circumstances."). We additionally observe that the record contains sufficient

20

evidence that the aggregate amount of money appropriated from the complainants was more than $100,000, and such evidence has not been contested.[18]

Based on the evidence presented, a rational jury could have reasonably concluded the State met its burden, proving each element of aggregated theft—including same scheme and continuing course of conduct. *See Chambers*, 580 S.W.3d at 156. Accordingly, we hold the evidence is legally sufficient to support the jury's finding that Williams committed theft in the aggregate value of more than $100,000, but less than $200,000. *See* Act of May 19, 2011, 82nd Leg., R.S., ch. 323, § 1, sec. 3(c)(5), 2011 Tex. Gen. Laws 941, 942 (amended 2017) (current version at TEX. PENAL CODE ANN. § 31.03(a), (e)(6)); *Braughton*, 569 S.W.3d at 608.

## C. Securities Fraud

The Texas Securities Act, in part, prohibits the use of fraud or fraudulent practices in connection with the sale or offer of securities. TEX. REV. CIV. STAT. ANN. art. 581-29(C)(1)-(4); *Bridwell v. State*, 804 S.W.2d 900, 903 (Tex. Crim. App. 1991) (*Bridwell II*), *aff'g* 761 S.W.2d 401, 405 (Tex. App.—Dallas 1988) (*Bridwell I*). "When amounts are obtained in violation of this Act under one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense." *Id.* art. 581-29-2.

---

[18] Williams's does not dispute the sufficiency of the evidence of the amounts appropriated from John, White, or Kearney, which exceed the statutorily required minimum. *See* Act of May 19, 2011, 82nd Leg., R.S., ch. 323, § 1, sec. 3(c)(5), 2011 Tex. Gen. Laws 941, 942 (amended 2017) (current version at TEX. PENAL CODE ANN. § 31.03(e)(6)). Therefore, having determined that there was sufficient evidence to prove that the alleged theft offenses were a part of the same scheme or continuing course of conduct, we need not address Williams's ancillary claim of whether the record contains sufficient evidence to support the challenged elements with respect to Pierce. *See Kent v. State*, 483 S.W.3d 557, 562 (Tex. Crim. App. 2016) ("As long as the jury unanimously agrees that the proven thefts that comprise the elements of aggravated-theft exceed the threshold amount and the thefts are proven beyond a reasonable doubt, regardless of which transactions each juror believes to have occurred, the aggregated-theft is proved.").

Article 581-4(F) defines "fraud or fraudulent practice" to include "any misrepresentations, in any manner, of a relevant fact; any promise or representation or predication as to the future not made honestly and in good faith, or an intentional failure to disclose a material fact." An omitted fact is material if there is a "substantial likelihood that it would have assumed actual significance in the deliberations of a reasonable investor, in that it would have been viewed by the reasonable investor as significantly altering the total mix of available information used in deciding whether to invest." *See Bridwell II*, 804 S.W.2d at 904; *Hays v. State*, 370 S.W.3d 775, 782 (Tex. App.—Texarkana 2012, no pet.). The material facts a defendant is charged with failing to disclose are alternate means or modes of committing the same offense. *Murchison v. State*, 93 S.W.3d 239, 257–59 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd); *Warr v. State*, No. 14-18-00058-CR, 2020 WL 428916, at *9 (Tex. App.—Houston [14th Dist.] Jan. 28, 2020, pet. ref'd) (mem. op., not designated for publication).

In the indictment and jury charge, the State alleged fifteen different means or modes by which Williams allegedly committed fraud in connection with the sale and offer for sale of securities. In summation, the State alleged Williams "intentionally fail[ed]" to disclose: (1) several judgments and liens held against Williams for the preceding 10-year period; (2) "that prior investment programs sold by the defendant . . . had not performed as promised and that clients who were sold interests in such programs had experienced significant losses of their investments;" (3) "that investor funds would be used for purposes other than those intended"; and (4) "the true financial condition of Favor Ministries and other companies that defendant was affiliated with, and the personal financial condition of [Williams]." Thus, a hypothetically correct jury charge here would

instruct the jury to find Williams guilty of securities fraud if he sold or offered for sale investment contracts, promissory notes, and evidences of indebtedness to investors, in an amount exceeding $100,000 in the aggregate, and if, in connection with the sale and offers for sale of said securities, he committed fraud by intentionally failing to disclose any one of the aforementioned material facts. *See* TEX. REV. CIV. STAT. ANN. art. 581–29(C)(1), (4)(c); *see also Mays v. State*, No. 13-14-00653-CR, 2016 WL 1747035, at *10 (Tex. App.—Corpus Christi–Edinburg Apr. 28, 2016, no pet.) (mem. op., not designated for publication).

Williams narrowly claims, once more, that there is no evidence of the same scheme or continuing course of conduct, and our analysis mirrors that as before. The method by which Williams defrauded investors was also constant here: Williams, through Favor Ministries and "The Favor Investment Program," sold investor contracts involving commercial real estate transactions that he asserted would generate large returns over a specified time period; Williams then, using investor funds from a bank account he controlled, spent over $100,000 of investor monies on his private residence mortgage payments and utilities, automobiles, travel, restaurants, retail purchases, and miscellaneous personal expenses; Williams made these personal expenditures without authorization from investors and in explicit defiance of what he had told investors that their money would be used for—the investment of a commercial real estate property; and Williams failed to disclose to each investor several pieces of material facts at the time of their initial investment. *See* TEX. REV. CIV. STAT. ANN. art. 581-29-2 (providing that a violation may arise from "under one scheme or continuing course of conduct, whether from the same or several sources"); *Bridwell II*, 804 S.W.2d at 904; *see also Warr*, 2020

WL 428916, at *9. Moreover, all four complainants testified to the individual amounts paid to Williams and the investments' articulated purpose as told to them by Williams.[19] Each stated that they would not have invested had they been aware of Williams's financial disposition, significant outstanding judgments, or that he would use their investment monies for personal expenses. In other words, it need not matter that the individual real estate investment properties he sought investors for differed because Williams's method of fraudulent inducement was sufficiently similar so as to constitute "one scheme or continuing course of conduct." TEX. REV. CIV. STAT. ANN. art. 581-29-2; *see Bridwell II*, 804 S.W.2d at 904; *see also Mays*, 2016 WL 1747035, at *13.

Having viewed the evidence in a light most favorable to the verdict, the jury could have reasonably believed the challenged element of securities fraud, based on the manner and means alleged, were met.[20]  *See* TEX. REV. CIV. STAT. ANN. art. 581-29(C)(1)-(4); *Bridwell II*, 804 S.W.2d at 904; *see also Padilla*, 326 S.W.3d at 200; *Hooper*, 214 S.W.3d at 13.

**D.    Statute of Limitations**

We next turn to Williams's assertion that the statute of limitations ran prior to the State's indictments.

We review whether the statute of limitations for an offense has expired prior to the charge under a de novo standard of review. *See Martinez*, 527 S.W.3d at 323; *see also*

---

[19] Williams does not dispute these amounts.

[20] For reasons noted *supra*, we need not address whether the record contains sufficient evidence to show the individual challenged elements with respect to Pierce. *See Kent*, 483 S.W.3d at 561–62; *Martinez*, 527 S.W.3d at 323; *see also Murchison v. State*, 93 S.W.3d 239, 259 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (employing cases analyzing the aggregate theft statute in its analysis of TEX. REV. CIV. STAT. ANN. art. 581-29-2, noting the similarities between both statutes).

*State v. West*, ___ S.W.3d ___, ___, No. 08-18-00190-CR, 2020 WL 746634, at *2 (Tex. App.—El Paso Feb. 14, 2020, no pet. h.).

Where multiple offenses are presented in aggregate, the statute of limitations runs from the date the last element was performed of the last offense. Thus, the statute of limitations runs here from the date of which the last alleged episode of appropriation of investor funds and fraudulent sale of investment securities occurred. *See Tita v. State,* 267 S.W.3d 33, 35 n.1 (Tex. Crim. App. 2008); *see also Villarreal v. State*, 504 S.W.3d 494, 511–12 (Tex. App.—Corpus Christi–Edinburg 2016, pet. ref'd) (finding appropriation occurred in an aggregate theft case when defendant induced the complaining witness to sign the contract); *Anderson v. State*, 322 S.W.3d 401, 407–08 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (providing that the statute of limitations began to run when the defendant received the last money from the last investor).

Williams was indicted of aggregate theft and securities fraud on April 13, 2017.[21] The last alleged act of unlawful appropriation, an element of theft, and fraudulent sale, an element of securities fraud, occurred when Pierce executed the $5,000 personal check that he believed was to be used for the purpose of investing through Favor Ministries on April 21, 2012—less than five years before either indictment was filed and within the statute of limitations period. Williams does not dispute this date, instead asserting that we should not consider Williams's alleged appropriation of Pierce's money in the aggregate because the scheme was too far removed from the scheme implicating the remaining

---

[21] We observe that Williams was indicted under the Texas Securities Act on December 16, 2016, and the first indictment tolls the statute of limitations to all allegations of "same conduct, same act, or same transactions." *Hernandez v. State*, 127 S.W.3d 768, 769 (Tex. Crim. App. 2004). For purposes of our analysis, we operate under the most recent indictment date as the disposition remains unaffected absent any tolling considerations.

complaining witnesses, an issue we have already discussed at-length and resolved against Williams. Therefore, we conclude the indictments were not barred by the statute of limitations. *See* TEX. CODE CRIM. PROC. ANN. art. 12.01(4)(A); TEX. REV. CIV. STAT. ANN. art. 581-29-1; *see also Tita,* 267 S.W.3d at 35 n. 1; *Villarreal*, 504 S.W.3d at 511–12; *Anderson*, 322 S.W.3d at 407–08.

We overrule Williams's sole issue on appeal.

### III. CONCLUSION

We affirm the trial court's judgment in both cause numbers.

GREGORY T. PERKES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
23rd day of April, 2020.

26